WJM, INC., etc., et al.,
Plaintiffs, Appellees,

v.

MASSACHUSETTS DEPARTMENT OF PUBLIC WELFARE, Defendant, Appellant.

No. 87–1111.

United States Court of Appeals, First Circuit.

Heard Sept. 9, 1987.
Decided Feb. 24, 1988.

Despena Fillios Billings, Asst. Atty. Gen., with whom James M. Shannon, Atty. Gen., Boston, Mass., was on brief, for defendant, appellant.

Paul P. Daley with whom Lisa A. Miller and Hale and Dorr, Boston, Mass., were on brief, for plaintiff, appellee Senior Care Associates, Inc.

Albert F. Cullen, Jr., with whom Cullen & Wall, Boston, Mass., was on brief, for plaintiff, appellee WJM, Inc.

Before CAMPBELL, Chief Judge, GARTH,* Senior Circuit Judge, and SELYA, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

Two nursing homes, after petitioning for bankruptcy, sought to recover from the Massachusetts Department of Public Welfare ("Department" or "DPW") monies they claim were owed to them as reimbursement for expenses incurred in the care of Medicaid patients. The bankruptcy court, 65 B.R. 531, entered a judgment against the Department; the district court affirmed. The Department appeals, raising difficult issues of Eleventh Amendment immunity and bankruptcy law.

We affirm in all respects but the awarding of interest.

I. BACKGROUND

Under the Massachusetts Medical Assistance Program, *see generally* Mass.Gen. Laws ch. 118E (1987), the DPW administers funds appropriated by the federal government and transferred to the commonwealth for the medical care of people who cannot afford to pay for such care themselves, *see* 42 U.S.C. §§ 1396 *et seq.* (1982 & Supp. IV 1986). Health care providers—such as the nursing homes in this case—that serve these needy patients are reimbursed by the DPW for their expenses. The terms of the relationship between the nursing homes and the DPW are spelled out in a "provider agreement" that a home must enter into each year with the DPW. A home promises, inter alia, to maintain certain business records and to comply with applicable state and federal regulations; the Department,

in turn, agrees to reimburse the home and to provide it with an opportunity to appeal from a finding of a payment liability, *see infra*, or termination from the program.

Homes are reimbursed under the provider agreements according to a so-called retrospective payment system. The Department disburses funds to the homes on a monthly basis in accordance with an estimated per diem rate, called the "interim" rate, which is fixed at the beginning of the year by the state Rate Setting Commission ("Commission"), an agency empowered under Mass.Gen.Laws ch. 6A, § 32 (1986). (The Commission bases the interim rate on a home's actual operational costs from the prior year.) At the end of the year, the nursing homes file reports of their actual costs for that year. On the basis of these reports, the Commission determines each home's actual reimbursable costs and establishes the home's "final" rate of reimbursement for that year. If the home's final rate exceeds the interim rate under which it received its monthly payments from the Department, the Department must credit the difference to the facility. Conversely, if the interim rate is greater than the final rate, the home becomes liable to the Department for the "overpayment." (In either case the sum owed is calculated by multiplying the difference in the two rates by the allocable number of "patient days.")

A layer of administrative regulations governs the procedures for the recovery of monies when the two rates diverge. *See* Mass.Regs.Code tit. 106, §§ 456.701–704 (1987). The particular subject of controversy in this case is a regulation that allows the Department to deduct, from the amount it owes one home, the amount the Department is owed by a second home that is under common ownership with the first.[1]

---

* Of the Third Circuit, sitting by designation.

1. Under the relevant part of Mass.Regs.Code tit. 106, § 456.703,

[l]iabilities incurred due to retroactive rate decreases shall be settled through repayment of the entire liability by the provider or deduction from current payments of the entire liability by the Department. At the discretion of the Department, when a lump settlement is

financially impossible, repayments may be made in the following manner through deductions from current and retroactive payments (payrolls) made to the provider:

. . . .

(B) If, after the first 12 months of deductions, the entire liability has not been settled, the Department shall then deduct monthly either 15 percent of each month's cash disburse-

The plaintiff-debtors in this case are four Massachusetts corporations engaged in the business of operating nursing homes: Rockview, Inc. (d/b/a Mary Murphy Nursing Home) ("Mary Murphy"); Walter M., Inc. (d/b/a Middlesex Manor Nursing Home) ("Middlesex Manor"); WJM, Inc. (d/b/a Winter Hill Nursing Home) ("Winter Hill"); and Senior Care Associates, Inc. (d/b/a Plainville Nursing Home) ("Plainville"). During the relevant period, each of these four homes was jointly owned by Walter Mikolinski and Anthony Accaputo.

In late 1985, the Commission notified Mary Murphy and Middlesex Manor that they were indebted to the Department in the amounts of $241,547.23 and $208,464.82, respectively, based on revised final rates revealing Medicaid overpayments to Mary Murphy in 1979 and 1980 and to Middlesex Manor in 1980 and 1981. After unsuccessfully making demand upon the homes for the amount of the overpayments, the Department, relying on the regulation described above, offset [2] approximately 15 percent of these liabilities ($69,740.50) against the Department's monthly payments to Plainville and Winter Hill.[3] In early March 1986, within 90 days of these offsets, Winter Hill and Plainville filed voluntary Chapter 11 petitions under the Bankruptcy Code, see 11 U.S.C. §§ 101 et seq. (1982 & Supp. IV 1986). In fact, by the end of March 1986 all four of the nursing homes had filed for bankruptcy.[4] Since then they have operated as debtors-in-possession.

On March 13, 1986, plaintiffs commenced an adversary proceeding against the DPW seeking, inter alia, to recover the sums withheld by the Department on the ground that the transactions were preferential transfers under 11 U.S.C. § 547 (1982 & Supp. IV 1986). By memorandum and order dated September 16, 1986, the bankruptcy court found that the DPW's offsets were indeed voidable preferential transfers of property belonging to Plainville and Winter Hill. The court ordered the Department to pay $56,646.36 to Winter Hill and $13,094.14 to Plainville. The district court affirmed in a memorandum and order dated December 30, 1986, awarding interest *sua sponte.*

Important to arguments raised in this appeal are certain proofs of claim filed by two agencies of the Commonwealth of Massachusetts in the nursing homes' Chapter 11 proceedings: 1) between December 1985 and April 1986, the Department of Revenue filed proofs of claim against each home for unpaid taxes; and 2) the Department of Public Welfare filed proofs of claim in at least three of the four homes' bankruptcy proceedings on August 29, 1986, about three months after the completion of the trial in the bankruptcy court of the adversary action against the DPW, but a month before the bankruptcy court had entered judgment. The DPW's claim against each home was for "payments for services rendered to Medicaid recipients ... in excess of the debtor's allowable costs" during all prepetition periods, including those years

**Winter Hill**

| | |
|---|---|
| January 5, 1986 | $12,391.65 |
| February 3, 1986 | $11,027.25 |
| February 27, 1986 | $33,227.46 |

**Plainville**

| | |
|---|---|
| December 31, 1985 | $ 7,708.00 |
| February 3, 1986 | $ 5,386.14 |

4. Plaintiff Mary Murphy had previously filed a voluntary petition for bankruptcy on October 25, 1985; Middlesex Manor filed a petition on the same day as Plainville, March 7, 1986. Pursuant to the March 21, 1986, motion of the nursing homes, the four Chapter 11 cases were consolidated for procedural purposes.

---

ments to the provider or an amount equal to one-twelfth of the liability outstanding at the end of the first twelve months, whichever is greater. This shall continue until the entire liability has been settled.

. . . .

(E) If two or more facilities are, or were, under a common ownership, and if one or more of the facilities is owed money by the Commonwealth, the Department may offset the provider's liability to the Department against the Department's liability to the provider.

2. We use "setoff" and "offset" for descriptive purposes only, without intending that technical or legal significance be attached to these terms.

3. The offsets were made on the following dates and in the following amounts:

for which the Commission had yet to set final rates.

The Department of Public Welfare raises several issues on appeal. Its first argument is that the Eleventh Amendment barred the relief given to plaintiffs. The Department also makes four arguments under 11 U.S.C. § 547 (1982 & Supp. IV 1986), the section of the Bankruptcy Code covering preferential transfers: first, that the DPW's offsets were not "transfer[s] of property" under section 547; second, that the debtors were not insolvent at the time the transfers were made; third, that the offsets were not voidable transfers under section 547 because they fell under that section's exception for transactions made in the "ordinary course of business," *id.* at § 547(c)(2); and fourth, that the offsets were in truth "setoffs" under 11 U.S.C. § 553 (1982 & Supp. IV 1986), and thus outside the reach of section 547.

We address these contentions seriatim.

## II. THE ELEVENTH AMENDMENT

The nursing homes' action against the Massachusetts Department of Public Welfare presents claims of a type that would normally be barred by the Eleventh Amendment.[5] This is to say, their action is for the recovery of an accrued monetary liability and, as the judgment would be satisfied out of the state treasury, the Commonwealth of Massachusetts is the real party in interest. *See Edelman v. Jordan,* 415 U.S. 651, 663–68, 94 S.Ct. 1347, 1355–58, 39 L.Ed.2d 662 (1974). The nursing homes, however, contend that certain provisions of the Bankruptcy Code—either by themselves or together with actions taken by the commonwealth—effectively remove the bar otherwise imposed by the Eleventh Amendment.

### A. *Abrogation*

The argument plaintiffs most vigorously pursue is that section 547(b) of the Bankruptcy Code unequivocally creates a cause of action against a state, thereby abrogating the states' Eleventh Amendment immunity. That provision, when read with two other Code sections, 11 U.S.C. §§ 101(26), 106(c) (Supp. IV 1986), plainly sets forth a cause of action against a state. Section 547(b) provides that a debtor in possession may bring suit in federal court to "avoid any transfer of an interest in property ... to or for the benefit of a creditor"; section 106(c) provides that "a provision of [the Bankruptcy Code] that contains 'creditor' ... applies to governmental units"; section 101(26) defines "governmental unit" to include both a state and a state agency.

The difficulty with this argument is that the Supreme Court has yet to indicate whether Congress's power to abrogate— that is, to effectively remove—the states' Eleventh Amendment immunity extends to legislation enacted under Congress's Article I, § 8, power to "establish ... uniform laws on the subject of bankruptcies." In *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Court held that the 1972 amendments to Title VII of the Civil Rights Act of 1964, which unambiguously authorized a private suit for compensatory relief against a state, effectively abrogated the states' sovereign immunity. *Fitzpatrick* made much of the fact that the legislation at issue was enacted pursuant to Congress's authority under section 5 of the Fourteenth Amendment, which specifically grants to Congress the power to enforce the amendment's provisions "by appropriate legislation." While the Court has never held that only legislation enforcing the Fourteenth Amendment

---

5. The Eleventh Amendment provides:
 The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.
 In *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Supreme Court held that the Eleventh Amendment also bars a suit—such

as this one—by a citizen against his own state in federal court.
 Although some courts and commentators interpret *Hans* as recognizing a principle of structural "sovereign immunity," and not true Eleventh Amendment immunity, we see nothing as turning on these characterizations. We thus use the terms sovereign immunity and Eleventh Amendment immunity interchangeably.

can abrogate the states' Eleventh Amendment immunity, it remains unclear whether and to what extent legislation under other powers can effect such a result.[6]

Plaintiffs' contention that the states' immunity has been effectively abrogated under section 547 of the Bankruptcy Code finds support in a recent decision of the Seventh Circuit, *In re McVey Trucking, Inc.*, 812 F.2d 311 (7th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 227, 98 L.Ed.2d 186 (1987). Were we to adopt that rationale, we could dismiss Massachusetts' Eleventh Amendment defense without more.[7] But we are not inclined to go that route given the uncertainty that permeates the subject of abrogation. Instead, we think the Eleventh Amendment issue is better approached here from the perspective of waiver.

### B. *Waiver*

▆ Whether or not section 547(b) effectively abrogates the states' sovereign immunity, we think Massachusetts *waived* its Eleventh Amendment immunity against the nursing homes' claims by the action of its Department of Public Welfare in filing bankruptcy proofs of claim in the nursing homes' Chapter 11 proceedings. That a state waives its Eleventh Amendment im-

munity with respect to related claims brought against it by the bankrupt when it files such a proof of claim is provided in section 106(a) of the Bankruptcy Code, 11 U.S.C. § 106(a) (1982). That provision states,

> A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

▆ It is, of course, well settled that a state may waive its Eleventh Amendment immunity by, for example, enacting a statute to that effect, or by so providing in its constitution. *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 3145 n. 1, 87 L.Ed.2d 171 (1985). Such a waiver must be unambiguously manifested, and because of that requirement a state's mere participation in a federal program, accepting or administering federal funds thereunder, has been held insufficient to demonstrate the state's waiver of its immunity. *Id.* at 244–46, 105 S.Ct. at 3149–50; *Edelman v. Jordan*, 415 U.S. at 673, 94 S.Ct. at 1360–61. In *Atascadero*, the Court held that even a federal statute generally authorizing suit against "any re-

---

**6.** In *Parden v. Terminal Railway*, 377 U.S. 184, 190–93, 84 S.Ct. 1207, 1211–13, 12 L.Ed.2d 233 (1964), the Court indicated that Congress had the power to abrogate sovereign immunity when acting under the Commerce Clause. This particular aspect of *Parden* has never been overruled. But on several occasions subsequent to both *Fitzpatrick* and *Parden*, the Court has explicitly refused to either endorse or reject the position that section 5 is the sole grant of legislative power under which Congress can abrogate Eleventh Amendment immunity. *See Welch v. State Department of Highways and Public Transportation*, — U.S. —, 107 S.Ct. 2941, 2946, 97 L.Ed.2d 389 (1987) ("We assume, without deciding or intimating a view of the question, that the authority of Congress to subject unconsenting States to suit in federal court is not confined to § 5 of the Fourteenth Amendment."); *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 252, 105 S.Ct. 1245, 1261, 84 L.Ed.2d 169 (1985) (same). *See also Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 244 n. 4, 246–77 & n. 5, 105 S.Ct. 3142, 3149 n. 4, 3149–50 n. 5, 87 L.Ed.2d 171 (1985).

**7.** The nub of the argument that section 5 of the Fourteenth Amendment is not a unique empowerment of Congress is that the states, by ratifying the Constitution itself, thereby consented to suit in federal court whenever Congress so chooses to subject them under any constitutionally authorized exercise of its power. Several courts of appeals have embraced some variation of this position. *See McVey*, 812 F.2d 311 (finding an effective abrogation under Congress's Article I power to enact bankruptcy legislation); *County of Monroe v. Florida*, 678 F.2d 1124 (2d Cir.1982) (abrogation under Article IV extradition powers), *cert. denied*, 459 U.S. 1104 (1983); *Peel v. Florida*, 600 F.2d 1070 (5th Cir.1979) (War Powers Clauses); *Mills Music v. Arizona*, 591 F.2d 1278 (9th Cir.1979) (Copyright and Patent Clause).

There is some doubt whether these last three decisions are good law, however, as they were decided prior to *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 246, 105 S.Ct. 3142, 3149–50, 87 L.Ed.2d 171 (1985), where the Supreme Court ruled that a congressional intention to abolish the states' immunity must be expressed in clear, unequivocal language.

cipient of Federal assistance" did not warrant the conclusion that a state receiving such assistance had waived its immunity, for such a statute "falls far short of manifesting a clear intent to condition participation in the programs funded under the Act on a state's consent to waive its sovereign immunity." 473 U.S. at 247, 105 S.Ct. at 3150. The logical inference from this and other language in *Atascadero,* however, is that Congress *may* effectively condition a state's participation in a federal program on a state's consent to federal jurisdiction, so long as Congress manifests a clear intent to this effect.

■ Section 106(a) of the Bankruptcy Code manifests such a clear intent. Both a state and a state agency are included within the Bankruptcy Code's definition of "governmental unit." *See* 11 U.S.C. § 101(26) (Supp. IV 1986). Section 106(a) is thus distinguishable on this point from the general cause of action provided for by the statute in *Atascadero.* And the act by a governmental unit that will cause a waiver —the filing of a bankruptcy claim—is plainly described in section 106(a). The statute puts the state on notice that if it chooses to enter the federal government's exclusive bankruptcy preserve by filing a claim, it must pay a price: a partial waiver of its sovereign immunity.[8] The very title of section 106 of the Code—"Waiver of Sovereign Immunity"—sends a message to the states of Congress's intention thereunder. In short, because section 106(a) unambiguously alerts the states as to the consequence of filing a bankruptcy claim, we believe that a governmental unit that does so waives its sovereign immunity. We are assisted in this result by our belief that section 106(a) is both a reasonable and proper exercise of Congress's exclusive

power over bankruptcy: the forced waiver requires only that a state come into the proceeding on equal terms with others.

While section 106(a) is thus a statutory provision that lies within Congress's power, we must also address the DPW's arguments that the proofs of claim filed in this proceeding were not adequate to trigger the statute. The district court indicated otherwise.[9] After asserting that section 106(a) of the Code contains "a specific statutory waiver of sovereign immunity applicable to this case," and after quoting the text of section 106(a), the district court stated, "Having filed proofs of claim in each of the nursing home's Chapter 11 proceedings, the Commonwealth waived its right to claim sovereign immunity before the Bankruptcy Court." The court's choice of noun in this sentence—"the Commonwealth"—creates ambiguity as to whether it was referring to the proofs of claims filed by the Massachusetts Department of Revenue relative to unpaid taxes or to the proofs of claims filed by the Department of Public Welfare. (As noted earlier, these two state agencies both filed claims in the nursing homes' bankruptcy proceedings, at different times and for different debts. *See* Part I, *supra.*)

Regarding the proofs for unpaid taxes filed by the Massachusetts Department of Revenue, the DPW vigorously contends that since these did not arise out of the same transaction or occurrence as the nursing homes' action against the DPW, their filing did not trigger the Commonwealth's waiver of sovereign immunity under section 106(a) in respect to the nursing homes' claims.[10]

■ We agree with this much of the DPW's argument. We fail to see how the

---

**8.** The waiver is "partial" in the sense that the state exposes itself only to claims brought by the debtor that arise out of the same transaction or occurrence as its own claims against the debtor.

**9.** The bankruptcy court's memorandum accompanying its order does not advert to the DPW's Eleventh Amendment defense. Apparently the Department raised the defense in a motion to dismiss, a motion the bankruptcy court denied at an unreported pretrial conference.

**10.** The Department also argues that because the Department of Revenue and the Department of Public Welfare are two different "governmental units" under the Code, the filing of a claim by one agency could not trigger a waiver of sovereign immunity by the other. Because we conclude that the Department of Revenue's claims and the nursing homes' claims against the DPW did not arise out of the same transaction or occurrence, we find it unnecessary to resolve this nice question.

nursing homes' claims against the DPW, arising from their mutual contractual and financial dealings, can be said to have arisen out of "the same transaction or occurrence out of which" the Department of Revenue's back tax claims against the homes arose. 11 U.S.C. § 106(a), *supra*. To the extent the bankruptcy court or the district court may have believed that jurisdiction was proper because of the tax claims filed by the Department of Revenue, they erred.

There remain, however, the proofs of claim that were filed by the DPW itself in August 1986. These were not filed until the hearings in the adversary proceeding were concluded some months earlier (although at a time when the judge had yet to render a decision). We cannot say for sure whether either the bankruptcy court or the district court was ever specifically apprised, in connection with its determination of the adversary proceeding, of the filing of these claims.

■ Normally we would not consider any evidence that was not a part of the record of the appealed proceeding. The question of sovereign immunity, however, resembles a jurisdictional question—at least for the purpose of determining the proper scope of an appellate court's consideration of the issue. *See Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974). *See also Welch v. State Dep't of Highways & Public Transp.*, — U.S. ——, 107 S.Ct. 2941, 2947 n. 6, 97 L.Ed.2d 389 (1987). Appellate courts can and often must deal with jurisdictional matters on a more independent basis than others. *Cf. Sumner v. Mata*, 449 U.S. 539, 547 n. 2, 101 S.Ct. 764, 769 n. 2, 66 L.Ed.2d 722 (1981). Under section 106(a), the proofs of claim filed by the DPW in August 1986 waived the Commonwealth's sovereign immunity in respect to the nursing homes' related claims against it. And we think the waiver should be viewed as having retroactively validated the bankruptcy court's earlier, as well as

its subsequent, actions in the adversary proceeding.

It may seem strange that an adversary proceeding—arguably commenced in violation of the Eleventh Amendment [11]—was salvaged by the DPW's eventual filings of proofs of claim. Waivers, however, often control past events. If, in late August of 1986, while the bankruptcy court had the case under advisement, the DPW's attorney had announced to the court and to the parties, "We hereby waive our defense based on the Eleventh Amendment," there could hardly be any objection to holding the Department to its word. We ascribe this same effect to the DPW's filing of its bankruptcy claims against the nursing homes.

The DPW also argues that its filing of the proofs of claim for the Medicaid overpayments was not "voluntary." Specifically, the Department contends that, as it was required by federal law to attempt to recover the overpayments, it was in effect "coerced" to file the bankruptcy claims. The Department points to this court's decision in *Massachusetts v. Secretary of Health & Human Services*, 749 F.2d 89 (1st Cir.1984), which held that the statutory scheme by which the states receive federal grants for Medicaid expenses does not require the Secretary of HHS to reimburse the state for overpayments the state is unable to recover from health care providers. Accordingly, the Department argues that its failure to have attempted to recover its overpayments to Plainville and Winter Hill would have been in dereliction of its duty to the public fisc, hence the decision to file the claims cannot be said to be voluntary.

■ We appreciate the DPW's dilemma. But we reject the supposition, implicit in its argument, that a waiver of a constitutional right lacks validity simply because it is the outcome of a "no-win" situation. A decision to forego a constitutional protection is often difficult; the Constitution safeguards important rights. While an effective waiver must be "knowing and intelligent," *cf.*

---

**11.** As we decline to pass upon whether or not section 547 of the Bankruptcy Code abrogated the states' immunity, we cannot say for certain

that the case when begun sought relief in violation of the Eleventh Amendment.

*Faretta v. California,* 422 U.S. 806, 835–36, 95 S.Ct. 2525, 2541–42, 45 L.Ed.2d 562 (1975); *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), it may occur even when the waiving party is between a rock and a hard place. In *Faretta,* for example, the Supreme Court stated that a defendant who wished to waive his right to counsel "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" 422 U.S. at 835, 95 S.Ct. at 2541 (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 241–42, 87 L.Ed. 268 (1942)). Here, while either choice may have been unpalatable, the DPW had its eyes open when it resolved the dilemma by filing the claims.

 The DPW also contends that a section 106(a) waiver was not triggered because the Department's claims and the nursing homes' claims against the DPW did not arise out of the same transaction or occurrence. The legislative history of section 106(a) indicates that the analysis to be used in determining whether two claims arise out of the same "transaction or occurrence" is the same as a court would use in determining whether a claim is a compulsory counterclaim under Rule 13(a) of the Federal Rules of Civil Procedure.[12] The proofs of claim the DPW filed against Plainville and Winter Hill, the two plaintiff nursing homes, are for "payments of services rendered to Medicaid recipients in excess of the debtor's allowable costs." From each home, the Department seeks recovery of a specified sum, "plus amounts as yet unliquidated." The proofs of claim note that certain amounts are as yet unliquidated because the Rate Setting Commission has yet to set final reimbursement

rates for all pre-petition periods. In short, the DPW is seeking to recover from Plainville and Winter Hill the sum total of all the annual "overpayments" made to each home prior to the filing of their bankruptcy petitions. The "transaction" from which these claims arose is thus most readily defined as the course of dealings between the DPW and each home under the provider contracts.

The claim brought by the two nursing homes arose out of this same series of interrelated dealings. The transfers the homes sought to have voided were transfers of their property that the DPW had made because of its alleged rights under the same contracts—the provider agreements—that give rise to the homes' alleged liability to the DPW. *Cf. King Brothers Products, Inc. v. RKO Teleradio Pictures, Inc.,* 208 F.Supp. 271, 275 (S.D.N.Y.1962) ("The spirit and intent of Rule 13(a) requires that the entire contractual relationship be deemed to be included within the word 'transaction' in cases sounding in contract.").

### C. *Interest*

A remaining question is the validity of the district court's award of interest. In the penultimate sentence of its memorandum and order affirming the bankruptcy court, the district court stated that it "affirm[ed], with interest, the order of the Bankruptcy Court." Subsequently, in response to the DPW's motion for a clarification of this ruling, the district court held that only prejudgment interest should be awarded. On neither occasion did the district court indicate any statutory basis for its ruling. We agree with the DPW that it was error to award prejudgment interest.

---

**12.** The report accompanying this provision reads in relevant part:

> First, the filing of a proof of claim against the estate by a governmental unit is a waiver by that governmental unit of sovereign immunity with respect to compulsory counterclaims, as defined in the Federal Rules of Civil Procedure, that is, counterclaims arising out of the same transaction or occurrence. The governmental unit cannot receive a distribution

from the estate without subjecting itself to liability it has to the estate within the confines of a compulsory counterclaim rule. Any other result would be one-sided. The counterclaim against the governmental unit is without limit.

S.Rep. No. 989, 95th Cong., 2d Sess. 29–30, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5815–5816. *See In re Zera,* 72 B.R. 997, 1000 (Bankr.D.Conn.1987).

The Department points out that a recent Supreme Court case, *Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), is controlling on this point. In *Shaw*, the Court held that *federal* sovereign immunity prohibited a plaintiff who had prevailed in a Title VII action against the federal government from recovering an attorneys' fee award that had been adjusted upward to compensate counsel for delay in receiving payment for the legal services rendered. At the heart of the Court's reasoning was its conviction that the adjustment for delay was tantamount to an award of prejudgment interest. *Id.* 106 S.Ct. at 2965 (noting that both "are designed to compensate for the belated receipt of money"). And since prejudgment interest is an element of damages distinct from damages on the substantive claim, *id.* at 2961 (citing C. McCormick, *Damages* § 50, at 205 (1935)), it is likewise analytically distinct from the substantive claim for the purposes of sovereign immunity. Thus, the Court held, the sovereign's immunity with respect to interest can be overcome only by "express congressional consent to the award of interest separate from a general waiver of immunity to suit." *Id.* In *Shaw*, the Court concluded that because Title VII—the statute at issue there—contained no such express consent the district court had erred in adjusting the fee award.

In *Rogers v. Okin*, 821 F.2d 22 (1st Cir. 1987), a panel of this circuit held the rule of *Shaw* applicable in the context of Eleventh Amendment immunity. Whereas in *Shaw* the inquiry was whether the federal government, *i.e.*, Congress, had waived its immunity by statute, the inquiry in a state sovereign immunity context is whether either a congressional abrogation or state waiver has occurred. *See* Part II, *supra.* The *Rogers* court found nothing in the rele-

vant attorneys' fee statute (42 U.S.C. § 1988) there that indicated Congress's intent to abrogate the states' immunity from awards of prejudgment interest, and concluded that the state had not waived its immunity with respect to such an award. Thus, it vacated the district court's upwardly adjusted fee award.

■ It follows from *Shaw* and *Rogers* that the award of prejudgment interest in the present case is invalid unless either the Commonwealth waived its immunity with respect to such an award or Congress expressly indicated its intention to subject states to this element of damages. *See supra.* We reject at the outset the possibility that the DPW's waiver under section 106(a) of the Bankruptcy Code amounted to a waiver of its immunity from an award of interest. That section says nothing about interest. Nor can we find any other section in the Code that speaks to interest. *See In re Missionary Baptist Foundation of America*, 69 B.R. 536, 537–38 (Bankr.N. D.Tex.1987) ("The Bankruptcy Code does not specifically allow prejudgment interest nor does it specifically prohibit prejudgment interest.... [I]t is in the equitable discretion of this Court to allow prejudgment interest.") (citation omitted). *See also 4 Collier on Bankruptcy* ¶ 550.02, at 550–6 (L. King 15th ed. 1987). And appellees have adverted to no other federal statute that could be the basis for an award of prejudgment interest in this case.[13] We conclude, therefore, that the district court's award of interest was error.[14]

We turn next to the issues of bankruptcy law.

## III. BANKRUPTCY ISSUES

■ Section 547 of the Bankruptcy Code covers preferential transfers. The

---

**13.** In their brief, appellees "presume" that the district court awarded prejudgment interest on the basis of Massachusetts law, to wit, Mass. Gen.Laws ch. 231, § 6C (1985). But the availability of an award of prejudgment interest in an action arising under a federal statute, such as the action brought by the nursing homes, is a matter of federal law, not the law of the forum state. *See Segal v. Gilbert Color Systems, Inc.*, 746 F.2d 78, 82–83 (1st Cir.1984); *Poleto v. Con-*

*solidated Rail Corp.*, 826 F.2d 1270, 1274 (3d Cir.1987).

**14.** We refuse to consider appellees' argument that postjudgment interest should have been awarded, as appellees did not file a notice of appeal and otherwise pursue a cross appeal on this point.

consequence of a determination that a transaction was a preferential transfer of the debtor's property is that the trustee—or, in this case, debtor-in-possession [15]—may "avoid" that transfer. This so-called "avoiding power" of a debtor-in-possession is asserted through an action under section 550 to recover the property transferred. The bankruptcy court in the present case found that the DPW's offsets of the liabilities of Mary Murphy and Middlesex Manor against the DPW's liabilities to Plainville and Winter Hill were preferential transfers of the property of the latter homes within the meaning of section 547(b), and thus voidable by the plaintiff-debtors. It entered a judgment requiring the Department to pay to the homes the amounts it had withheld.

The DPW makes the following arguments on appeal: 1) the offsets were not "transfer[s] of property" under section 547; 2) plaintiffs were not "insolvent" at the time of the offsets; 3) the offsets fell under section 547's exception for transactions made "in the ordinary course of business," section 547(c)(2); and 4) the offsets were in truth "setoffs" as defined by section 553, thus outside the reach of section 547.[16]

We proceed to these arguments.

### A. Transfer of Property

The Department claims the offsets were not transfers of property under section 547(b). Specifically, the Department argues that such an offset is neither a "transfer" nor a disposition of "property." As these ostensibly distinct arguments are intertwined, we consider them together.

Under the relevant part of the Bankruptcy Code's definitional section, 11 U.S.C. § 101,

"transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or

parting with property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

*Id.* § 101(50) (Supp. IV 1986). The comprehensiveness of this definition is underscored in its legislative history:

A transfer is a disposition of an interest in property. The definition of transfer is as broad as possible.... Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody or control even if there is no transfer of title, because possession, custody and control are interests in property.

S.Rep. No. 989, 95th Cong., 2d Sess. 27, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5813. *See also National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 184, 32 S.Ct. 633, 635, 56 L.Ed. 1042 (1912) ("It is not the mere form or method of the transaction that the Act condemns....") (interpreting similar definition of "transfer" in former Bankruptcy Act).

"Property," on the other hand, is not defined by the Code. Rather, the apparent expectation is that, as in other contexts, *see, e.g., Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed. 2d 548 (1972), the determination whether something is an interest in property shall be made by reference to state law. *See* 4 *Collier on Bankruptcy* ¶ 547.03, at 547–22 & n. 19 (L. King 15th ed. 1987). *See also In re Riddervold,* 647 F.2d 342, 344–47 (2d Cir.1981) (Friendly, J.) (applying state property law).

According to the DPW, the bankruptcy court disregarded pertinent state law in ruling that the offset procedure resulted in a "transfer of property." The Department contends that, as a matter of state law, Plainville and Winter Hill did not have a

---

**15.** Section 547(b) refers only to the avoidance power of a "trustee," but under section 1107 of the Code this same power is enjoyed by a debtor-in-possession.

**16.** Although there are five elements of a preferential transfer under section 547(b), only one of

these elements is in dispute here, namely, whether the transfer was made "while the debtor was insolvent." (The threshold question—whether the transaction was a "transfer of property"—is not normally considered an "element" of a preferential transfer.)

property interest in their monthly payments from the DPW. To support its position, the DPW relies on language in a decision by the Supreme Judicial Court of Massachusetts ("SJC"), *Haverhill Manor, Inc. v. Commissioner of Public Welfare,* 368 Mass. 15, 330 N.E.2d 180, *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). In *Haverhill Manor* the SJC gave the following description of the relationship between the Department of Public Welfare and a nursing home receiving Medicaid reimbursement:

> [T]he relationship between the department and Haverhill Manor appears analogous to a relationship between other parties doing business which would create a "mutual and open account current" or a simple "running (open) account." In either case, and, by extension, in this case, one party owes to the other party only the balance in the account at the particular time, and charges by each may satisfy charges by the other. The balance owed by either is computed by setting off charges against favorable items.

*Id.* at 22, 330 N.E.2d at 186 (citations omitted). Reading these words as the dispositive characterization of DPW-nursing home relations, the Department constructs the following argument. Since "[the DPW] owes to [a nursing home] only the balance in the account at the particular time," a nursing home's right to any disbursement —including its expected monthly stipend— depends wholly on its balance in the DPW's account. This balance, in turn, is determined by reference to the provider agreements, which stipulate that the homes are bound by applicable state and federal regulation, including the state regulation providing for the offset procedure. Thus, at the moment the DPW made its offsets against Plainville and Winter Hill, withholding part of their monthly disbursements, the Department paid the homes exactly what they were owed. Since the homes were not "owed" any more than they received, the offset transactions were not "transfers," and the homes had no "property interest" in the withheld funds.

This argument has some force. But we think a close reading of *Haverhill Manor* indicates the DPW may have attached undue significance to the SJC's "running account" analogue. The issue before the SJC in *Haverhill Manor* was the validity of the DPW's use of an offset procedure apparently identical—though uncodified—to the one it employed here. The DPW had offset the amount of past (1968–1971) overpayments to Haverhill Manor Nursing Home and homes affiliated with Haverhill Manor against the Department's current (1973) monthly disbursements to Haverhill Manor. (The consequence of this offset was that Haverhill Manor was to receive *no* payments for services rendered in 1973.) The homes had filed administrative appeals from the Commission's determination of the final rates that had been the basis for the conclusion that overpayments had been made.[17] These appeals were still pending in 1973.

In holding the DPW's action permissible as a matter of state administrative law, the SJC observed that the DPW's offset procedure was an expeditious method of protecting the public fisc, avoiding a "multiplicity of suits and circuity of action." *Id.* at 21, 330 N.E.2d at 186 (citation omitted). In reaching this conclusion, the court invoked the analogue of a "running account," perhaps to suggest that the offset procedure did not reflect either an odd or a one-sided relationship between the DPW and the home.

The SJC also addressed Haverhill Manor's claim that the offset procedure was a deprivation of property without due process of law. We think it is the SJC's discussion of this issue that ultimately undermines the DPW's argument in the present case. In addressing this claim, the SJC explicitly held, notwithstanding either the validity of the offset procedure or the resemblance of the DPW-nursing home reimbursement scheme to a "running account," that Haverhill Manor did in fact have a property interest in its current monthly payments:

---

**17.** Haverhill Manor had appealed from the 1971 rate and its affiliates had appealed from both the 1970 and 1971 final rates. 368 Mass. at 19 & n. 9, 330 N.E.2d at 185 & n. 9.

We do not question that Haverhill Manor has shown a property interest that is cognizable under the due process clause.... Under the law of the Commonwealth, Haverhill Manor had a valid claim of entitlement to the 1973 payments. It had provided health services in accordance with the law and was entitled to receive reimbursement under the interim rate for 1973 then in effect. Delay in receipt of the reimbursement deprived Haverhill Manor of the use of the funds during the period of delay. The use of the funds, itself, is a property interest which may not be taken by the Commonwealth without due process of law.

*Id.* at 23, 330 N.E.2d at 187 (citations omitted). The court's conclusion that Haverhill Manor had a property interest in its current payments seemed to rest on the possibility that the home might ultimately recover its withheld disbursement if it were successful in its appeal from the determination of the final rates for the overpayment years. *Id.* [18]

■ In short, the SJC did not find its own running account analogue dispositive of the question whether Haverhill Manor had a property interest in its monthly disbursements. We therefore conclude, in the present case, that Plainville and Winter Hill did indeed have a property interest in their monthly disbursements from the DPW.[19] Once this premise is accepted there seems little doubt, in light of the Code's broad definition of "transfer," that the DPW's withholdings were transfers of property for the purposes of section 547.

### B. *Insolvency*

■ One of the statutory requirements of a preferential transfer is that the debtor be insolvent at the time of the transfer. 11

U.S.C. § 547(b)(3). *See also id.* § 101(31) (Supp. IV 1986) (defining "insolvent"). The Department argues that if the value of the real estate occupied by Plainville and Winter Hill had been included in the computation of the homes' assets the homes would have been solvent. This real estate was owned by real estate trusts separate from the nursing home corporations. The thrust of the DPW's position is that because two individuals—Walter Mikolinski and Anthony Accaputo—effectively owned and controlled both the corporations and the trusts, the bankruptcy court should have "pierced the corporate veil" and included the value of the real estate in the debtors' assets.[20]

There is no dispute that the relevant substantive law on this issue is the law of Massachusetts and that the controlling case therefrom is *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748 (1968). There, the Supreme Judicial Court of Massachusetts made the following pair of observations about the circumstances under which it would be appropriate for a court to disregard the corporate form:

Where there is common control of a group of separate corporations engaged in a single enterprise, failure (a) to make clear which corporation is taking action in a particular situation and the nature and extent of that action, or (b) to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses, records, and finances, may warrant some disregard of the separate entities in rare particular situations in order to prevent gross inequity.

. . . . .

Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, appar-

---

**18.** The SJC ultimately concluded that the offset procedure was a permissible "summary administrative action," and that no due process violation had occurred. 368 Mass. at 25–30, 330 N.E.2d at 187–90.

**19.** As in *Haverhill Manor*, the final rates that led to the conclusion of an overpayment, thus triggering the offset procedure, have been appealed. The appeals are still pending.

**20.** We share the bankruptcy court's sense that "it is somewhat unclear whether the Department is recommending piercing the trust veils directly or whether it is recommending piercing the debtors' corporate veils to reach Mikolinski's and Accaputo's beneficial interests in the trusts."

ently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

*Id.* at 619–20, 233 N.E.2d at 752 (citation omitted). At trial, the DPW stressed the pervasive control exercised by Mikolinski and Accaputo over both the real estate trusts and the nursing homes themselves, and attempted to establish a "confused intermingling" of the two activities. Applying the *My Bread* standard, the bankruptcy court found that

the Department failed to demonstrate any fraudulent or injurious consequences to it or any element of injustice or fundamental unfairness with respect to it. The Department was fully apprised of the relationships involving the Debtors, the trusts, Management and Accaputo and Mikolinski and a result of the [required forms] filed with it over at least a four year period.

We have examined the record with care and find that the bankruptcy court's ruling on this issue is fully supported. The Department was unable to establish the formal ambiguity *My Bread* requires, and the bankruptcy court thus correctly refused its request to disregard the corporate form.

■ The Department also contends the bankruptcy court improperly charged it with the burden of proving that the debtors were solvent. There was no error. By the plain terms of the statute, a debtor is presumed to be insolvent during the 90 days preceding its petition, the time period during which these transfers were made. 11 U.S.C. § 547(f) (1982). Although the Department could have rebutted this presumption by putting forth some evidence of solvency, thereby returning the ultimate burden of proof to the debtor, the Department's sole effort to rebut the presumption here was its unsuccessful attempt to have

the court disregard the corporate form. The Department thus did nothing to disturb the operation of the statutory presumption. *See generally* 4 *Collier on Bankruptcy* ¶ 547.06 (L. King. 15th ed. 1987).

### C. *The Ordinary Course of Business Exception*

The DPW further argues that even if its offsets were transfers of property, they were not voidable because they fall with section 547's "ordinary course of business" exception. Section 547(c)(2) provides,

(c) The trustee may not avoid under this section a transfer—

. . . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

Several bankruptcy courts have lamented Congress's failure to flesh out its concept of the "ordinary" under this section. *See, e.g., In re Magic Circle Energy Corp.,* 64 B.R. 269, 272 (Bankr.W.D.Okla.1986); *In re Bourgeois,* 58 B.R. 657, 658–59 (Bankr.W. D.La.1986). Nor is the sparse legislative history helpful in this regard, as the lone provision merely states that "[t]he purpose of this exception is to leave undisturbed normal financing relations, because it does not detract from the general policy preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5874.

■ But at least a few things about this exception are certain. First, "the creditor ... has the burden of proving the nonavoidability of a transfer under subsection (c) of [section 547]." 11 U.S.C. § 547(g) (Supp. IV 1986). Second, a careful reading shows the exception to have three distinct elements: the subject transfer

must be in payment of a debt that was *incurred* by the debtor in the ordinary course of its affairs with the creditor, the transfer itself must have been *made* during the ordinary course of these affairs, and the transfer must have been made according to ordinary business terms. Since the subsection is written in the conjunctive, each of these elements must be established by the creditor. Finally, there appears to be something of a consensus among courts and commentators on the purpose of this section, which one commentator has described as the protection of "recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee." 4 *Collier on Bankruptcy* ¶ 547.10, at 547–42 (L. King 15th ed. 1987). *Accord Magic Circle*, 54 B.R. at 272; *Bourgeois*, 58 B.R. at 659 (citing cases).

The DPW argues that by virtue of their common ownership and their agreement to abide by all relevant regulations, the four homes at issue here—Mary Murphy, Middlesex Manor, Plainville, and Winter Hill— were essentially "co-debtors." The debts incurred by Mary Murphy and Middlesex Manor (the debts triggering the offsets) were therefore the debts of Plainville and Winter Hill. And the Department assumes that because the offset procedure was perfectly permissible under both the provider agreements and the relevant state regulations, that the procedure was therefore "ordinary" for the purposes of section 547. From these two premises, the DPW concludes that its offsets were but "ordinary" recoveries of the debts of Plainville and Winter Hill.

We question, however, whether the DPW's offsets are the sort of transactions for which this exception affords a safe harbor. For one thing, these offsets—the purpose of which was to recoup overpayments made some two or three years previously—seems a far cry from the prototypical short term credit transaction the statute apparently addresses. For another, we have been shown no case, nor can we find one, where an *involuntary* transfer— such as the transfers here—was found to fall within this exception.

But the Department's argument is unpersuasive for a simpler reason: it failed to prove that the offsets were "made in the ordinary course of business or financial affairs of the debtor and the transferee," 11 U.S.C. § 547(c)(2)(B). The Department did not prove that it was ordinary, or customary, for the DPW to collect the debts of Mary Murphy and Middlesex Manor by deducting these monies from payments otherwise targeted for Plainville and Winter Hill. We think such a showing would be necessary to carry the burden of establishing this element of the exception. *See In re Day Telecommunications, Inc.*, 70 B.R. 904, 910 (Bankr.E.D.N.C.1987) ("In determining whether a payment satisfies the requirements of the ordinary course of business exception, a court should consider the prior course of dealing between the parties. . . ."); *Magic Circle*, 64 B.R. at 273 ("the cornerstone of this element of a preference defense is that the creditor needs demonstrate some consistency with other business transactions between the debtor and the creditor"). To the extent that *In re Economy Milling Co.*, 37 B.R. 914, 922 (D.S.C.1983), a case relied upon by the DPW, de-emphasizes this requirement, we are in disagreement with it.

In its brief, the Department argues that an affidavit of one Norman Flora, a DPW official, was sufficient to establish a past practice of such offsets. We disagree. The affidavit at most suggests that such offsets were permissible, or perhaps that they were used in the transactions relevant *in this particular case*. It does not suggest—except by the barest conclusions— that such offsets were "ordinary."

### D. *Setoff*

The Department's final argument is that its withholdings of payments due Plainville and Winter Hill were permissible setoffs of "mutual debt" under section 553 of the Bankruptcy Code. 11 U.S.C. § 553 (1982 & Supp. IV 1986). We agree with the bankruptcy court that the Department failed to demonstrate the requisite mutuality to bring the subject transaction within section 553. It is hornbook law that to be considered mutual, "debts must be in the same

right and between the same parties, standing in the same capacity." 4 *Collier on Bankruptcy* ¶ 553.04, at 553–18 (L. King 15th ed. 1987). We do not think the fact that the DPW's offset procedure is authorized by state regulation warrants the conclusion that the debt incurred by Mary Murphy and Middlesex Manor—the debt triggering the offset against Plainville and Winter Hill—can be seen as the debt of Plainville and Winter Hill for the purposes of the mutuality requirement.

## IV. CONCLUSION

We find that the Department of Public Welfare waived its sovereign immunity with respect to the claims brought against it by Plainville and Winter Hill. The bankruptcy court correctly found that the DPW's offsets were preferential transfers, thus avoidable by the debtors-in-possession. The district court erred by adding interest to the amount of the judgment entered by the bankruptcy court.

*We affirm the judgment of the district court in all respects with the exception of its award of interest, which is vacated.*