In re BANK OF NEW ENGLAND
CORPORATION, Debtor.

Ben S. BRANCH, Trustee, Plaintiff,

v.

ROPES & GRAY, Defendant.

Bankruptcy No. 91–10126.
Adv. No. 93–1017.

United States Bankruptcy Court,
D. Massachusetts.

Nov. 18, 1993.

Van Oliver, Andrews & Kurth, Dallas, TX, for plaintiff.

Richard W. Renehan, Sara Miron Bloom, Kurt S. Kusiak, Hill & Barlow, Boston, MA, for defendant.

*Memorandum Decision on Defendant's Motion for Summary Judgment*

WILLIAM C. HILLMAN, Bankruptcy Judge.

On January 8, 1993, the trustee commenced an adversary proceeding pursuant to 11 U.S.C. § 547(b) against defendant, Ropes & Gray ("R & G") to avoid a series of ten allegedly preferential transfers. The defendant filed an answer and later a motion for summary judgment (the "motion") pursuant to FRCP 56, made applicable to these proceedings by FRBP 7056. The trustee filed an objection.

The Court held a hearing on the motion and the opposition on September 8, 1993. At the hearing, both parties agreed that this case was an appropriate one for summary judgment, and the Court indicated that it could award summary judgment to either party despite the fact that the trustee did not file a cross motion. *See National Expositions Inc. v. Crowley Maritime Corp.,* 824 F.2d 131, 133 (1st Cir.1987); *Piccicuto v. Rex (In re Rex),* 150 B.R. 505 (Bankr.D.Mass. 1993). The Court then took the matter under advisement.

The Court finds that this case is an appropriate one for summary judgment as to most issues. The material facts are not disputed; only the legal significance and interpretation of those facts is in question.

The statements of fact which appear below constitute the Court's findings of fact. Conclusions of law will appear as appropriate.

## FACTS

On January 7, 1991, the Bank of New England Corporation ("BNEC" or the "Debtor") filed its petition under Chapter 7 of the Code. In November 1989, R & G had been retained by BNEC to provide legal services with relation to three specific matters: a shareholder derivative suit; an investor class action; and litigation involving the SEC.

From October 10, 1990 through December 21, 1990, BNEC made ten payments (the "challenged payments") to R & G by check or wire transfer totalling $614,889.08. All of these transfers occurred within ninety (90) days of BNEC's petition date. Each of the ten payments was for services provided by R & G in the matters mentioned above. BNEC made all of the subject payments pursuant to invoices issued to it by R & G. The trustee contends that the ten payments constitute voidable preferences under 11 U.S.C. § 547(b).

## DISCUSSION

FRCP 56 provides that summary judgment shall be granted:

"forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to judgment as a matter of law."

The burden of proof is on the moving party to demonstrate the lack of a genuine issue of material fact. *In re Wang Laboratories, Inc.*, 155 B.R. 289, 290 (Bankr.D.Mass.1993), and cases cited. The trustee has the burden of establishing the elements of a preferential transfer under § 547(b). 11 U.S.C. § 547(g). The burden of proving the elements of affirmative defenses under § 547(c) rests with the defendant. *Hickey v. Nightingale Roofing, Inc. (In re Alter–Hall Construction Co., Inc.)*, 73 B.R. 989, 992 (Bankr.D.Mass.1987), aff'd 83 B.R. 180 (1988).

In its answer and motion for summary judgment, R & G does not dispute that the subject payments satisfy the conditions of § 547(b). However, R & G asserts an affirmative defense of "ordinary course of business" payments under § 547(c)(2). For purposes of the motion for summary judgment, the Court will consider the § 547(b) preference elements to be admitted and will direct its discussion to the merits of R & G's affirmative defense.

The trustee may not avoid a transfer to the extent that the transfer (1) was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of both the debtor and the transferee; (2) the transfer was made in the ordinary course of business or financial affairs of the debtor and the transferee; and (3) according to ordinary business terms. § 547(c)(2)(A–C).

The focus of the parties in this case is upon the second element, whether payment was made in the ordinary course of the parties' business. The other two factors are not in dispute.

■ The purpose of the "ordinary course" exception is "to leave undisturbed normal financial relations ..." *Courtney v. Octopi, Inc. (In re Colonial Discount Corp.)*, 807 F.2d 594 (7th Cir.1986), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 526 (1987), because an otherwise preferential transfer made "in the ordinary course of business" does not detract from the general policy of § 547(b) of discouraging unusual action by the debtor or its creditors during the debtor's slide into bankruptcy. *WJM, Inc. v. Massachusetts Department of Welfare*, 840 F.2d 996, at 1010 (1st Cir.1988).

■ The Code does not define "ordinary course," but, the courts have considered the issue in a multitude of cases. "To qualify for the ordinary course exception, a creditor must prove that: (1) a debt and its payment are ordinary in relation to past practices between the debtor and the particular creditor; and (2) the payment was ordinary in relation to prevailing business standards." *WJM, Inc. v. Massachusetts Department of Welfare*, 840 F.2d 996, 1010–11 (1st Cir.1988); *Mordy v. Chemcarb, Inc., (In re Food Catering & Housing, Inc.)*, 971 F.2d 396, 398 (9th Cir.1992).

R & G's employment began in November 1989. R & G submitted to the Court a "Billing/Payment Summary" (see below) which illustrates R & G's billing history of BNEC during the year prior to the BNEC bankruptcy. From January 26, 1990 to August 8, 1990, R & G sent fifteen (15) invoices to BNEC for legal services. All of the payments made by BNEC during this period were made outside of the ninety (90) day preference period and are not the subject of this adversary proceeding.

| Invoice Date | Amount | Paid On | # of Days Outstanding |
|---|---|---|---|
| 1/26/90 | $12,744.11 | 2/26/90 | 31 |
| 3/21/90 | $25,954.71 | 6/20/90 | 91 |
| 4/24/90 | $12,626.82 | 5/21/90 | 27 |
| 5/04/90 | $50,541.24 | 7/13/90 | 70 |
| 5/15/90 | $15,560.20 | 6/18/90 | 34 |
| 5/16/90 | $14,685.72 | 6/18/90 | 33 |
| 6/11/90 | $ 2,657.31 | 6/16/90 | 5 |
| 7/02/90 | $ 2,343.83 | 7/26/90 | 24 |
| 7/02/90 | $35,717.03 | 7/26/90 | 24 |

| Invoice Date | Amount | Paid On | # of Days Outstanding |
| --- | --- | --- | --- |
| 7/02/90 | $40,124.42 | 7/26/90 | 24 |
| 7/13/90 | $50,864.17 | 9/20/90 | 69 |
| 7/13/90 | $44,764.27 | 8/28/90 | 46 |
| 7/16/90 | $44,459.92 | 8/28/90 | 43 |
| 8/24/90 | $30,942.23 | 9/21/90 | 28 |
| 8/24/90 | $38,496.83 | 9/21/90 | 28 |

■ R & G submits that this evidence should be relevant to the Court's analysis because the twelve month period preceding the preference period is an appropriate standard for determining the ordinary course of business between parties, citing *Lovett v. St.* *Johnsbury Trucking,* 931 F.2d 494, 498 (8th Cir.1991). This Court agrees.

For purposes of comparison, R & G also provided the Court with a billing chart of the ten payments made by BNEC to R & G during the preference period.

| Invoice Date | Amount | Paid On | # of Days Outstanding |
| --- | --- | --- | --- |
| 8/24/90 | $ 74,411.12 | 10/15/90 | 52 |
| 8/27/90 | $ 82,073.20 | 12/29/90 | 124 [1] |
| 9/07/90 | $114,614.27 | 11/01/90 | 55 |
| 9/07/90 | $ 35,644.09 | 10/19/90 | 42 |
| 10/12/90 | $ 33,841.39 | 11/28/90 | 47 |
| 10/12/90 | $ 86,977.28 | 12/10/90 | 59 |
| 11/16/90 | $ 52,484.28 | 12/28/90 | 42 |
| 11/16/90 | $ 27,397.50 | 12/28/90 | 42 |
| 11/16/90 | $ 80,197.88 | 12/28/90 | 42 |

■ R & G argues that the payment practices of BNEC during the pre-preference period and during the preference period were sufficiently consistent with each other to establish the "ordinary course of business" standard. In opposition, the trustee argues that the difference between the 54.7 day average outstanding during the preference period and the 38.4 day pre-preference average is significant enough to render the challenged payments outside of the ordinary course of business. In support, the trustee argues that all ten of the challenged payments were made outside the 38.4 pre-preference average, and he adds that the statistical probability of this occurring is approximately one in 10,000.[2]

While the Court does not question the accuracy of the trustee's mathematics or statistical computations, the Court does not find that the difference between the two averages is significant, with the exception of the payment made on December 29, 1990. The pre-preference practice of BNEC was to pay its R & G bills a little more than one month after the invoice date; the preference period practice was for BNEC to pay its R & G bills less than two months after the invoice date. Even though the preference period average is higher, the timing is still consistent with BNEC's general goal of paying its R & G bills "between 30 and 60 days after receipt of

1. This invoice will be considered separately, *infra.*

2. The Court appreciates that the trustee's statistical analysis includes the December 29, 1990 payment, but this is not important, as will be seen.

the bill." (Affidavit of Donald Williams, a member of the BNEC legal department at all relevant times).

A comparison of the averages of both periods gives this Court a holistic view of the parties' ordinary business conduct, and the Court finds that the average timing of the payments made during the preference period to be consistent with the prior practices of the parties.[3]

The trustee asserts a number of counter arguments to R & G's "ordinary course of business" defense. First, he argues that the R & G bills for services supplied from December 1989 through July 1990 were issued by R & G 29 days after the end of the month in which services were supplied, but on average, bills for services paid within the preference period were issued 11.25 days after the month of service ended. This was done, the trustee argues, to suit R & G's need to obtain payment before BNEC's ability to pay would evaporate.

The Court does not find the difference between billing dates to be sufficient to render BNEC's preference payments outside the ordinary course. To qualify for the ordinary course exception, a creditor must prove that a debt and its payment are ordinary in relation to past practices between the parties. The fact that R & G issued its bills to BNEC an average of 17.75 days more quickly during the preference period does not suggest that the debts they represented were not incurred in the ordinary course, nor does it change the fact that the payment of these bills was consistent with the prior practices of the parties, as noted above.

Next, the trustee alleges that R & G augmented its collection efforts during the preference period as it became aware of BNEC's worsening financial condition. According to the trustee, the challenged payments were paid to R & G in response to the "heightened efforts," and such efforts render the challenged payments outside the ordinary course,

citing *Marathon Oil Co. v. Flatau (In re Craig Oil)*, 785 F.2d 1563 (11th Cir.1986).

In *Craig*, the Court stated that § 547(c)(2) should not protect payments made in response to "unusual" debt collection practices. "Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts." *Id.* at 1566.

In support of his argument, the trustee points to eleven cover letters sent to BNEC with R & G bills which noted that some amounts remained outstanding. The first letter (listed as "Plaintiff's Dep. Ex. 15 at 2) dated August 2, 1990, states in part: "Our Accounting Department has informed me that our May 1990 statements remain outstanding. I greatly would appreciate any help that you could gave us with respect to them." The second letter (listed as "Plaintiff's Dep. Ex. 17 at 2") dated September 10, 1990 states in part: "I understand that our June 1990 ... and our July 1990 statements are now with your accounts payable department. Thank you for your assistance with respect to them." The subsequent letters make substantially the same request of BNEC, i.e. to pay the outstanding bills.

The trustee argues that the pattern established in these letters "contrasts sharply" with cover letters and billing statements sent to BNEC in the pre-preference period, wherein no mention was made of outstanding invoices.

The Court does not find that R & G's requests rise to the status of "unusual collection efforts;" R & G requests were, in fact, quite mild. In *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494 (8th Cir.1991), the court held: "[the creditor's request] ... that [the debtor] accelerate its payments 'as much as possible' [does] not undermine our conclusion that the 12–month period fairly reflected the parties' ordinary course of business. It is hardly unusual for a creditor to urge its

---

3. The trustee argues that the Court's analysis should also be directed to an examination of the three payments made by BNEC closest in time to the beginning of the preference period. According to the trustee, such an examination would reveal that the average lapse between invoicing and payment in the three months before the start of the preference period is reduced to 31 days, more than 23 days less than the lapse of 54.7 days that was the pattern during the preference period. Even if the Court were to accord more weight to the payments made closest to the preference period, the amount of the variance is still insufficient to convince the Court that the challenged payments were outside of the ordinary course of business.

debtor to pay more promptly." *Id.,* at 499. This Court agrees with *Lovett* and does not find R & G's collection efforts during the preference period sufficient to render the challenged payments outside the ordinary course of business.

The trustee's next argument involves the circumstances and nature of the legal matters for which R & G was hired. In November 1989, R & G was hired by BNEC to defend it in a shareholder derivative suit (the "shareholder action") and in a class action (the "class action") commenced by purchasers of BNEC securities. In May 1990, R & G was asked to represent BNEC in connection with an investigation by the Securities and Exchange Commission (the "SEC litigation").

When R & G began its representation of BNEC in the shareholder and class actions, it was aware that BNEC's directors' and officers' liability insurance policy might cover the legal bills associated with the defense. No such coverage was available for legal bills incurred on the SEC litigation. The directors' and officers' policy had a $1 million deductible, requiring R & G to bill at least $1 million for work done on behalf of the officers and directors before R & G could seek payment from the insurance company.

The trustee avers that although R & G was under pressure to bill at least $1 million on the shareholder and class actions, it found itself in a position where it needed to devote most of its time to the SEC matter. According to the trustee, R & G adopted a new billing strategy to meet the $1 million mark so that it could seek reimbursement from BNEC's insurance policy.

R & G's "new billing strategy" was to revise its previous bills by allocating to the shareholder and class actions $42,000 which had previously been allocated to the SEC litigation. The trustee adds that R & G began to allocate from 50–66% of its time on the SEC litigation to the shareholder and class action bills in order to meet the $1 million mark.

R & G's bill revisions were described in the deposition of John D. Donovan Jr., a partner at R & G who supervised the BNEC defense. Pages 113–116 of Donovan's state, in relevant part:

Q: "Do you have any knowledge . . . regarding rates of attorneys working on BNEC matters during May 1990 or a need to revise the May 1990 professional statement?"

A: "Yes"

Q: "Do you know why Mr. Cameo requested revised May 1990 professional statements?"

A: "Yes, . . . My memory is that attorneys at Ropes and Gray working on the various matters . . . tended to record their time to a single file symbol although the work could properly be attributed to either the class action or the derivative action, or starting the end of May, the SEC investigation. We wanted to make sure the most accurate allocation of attorney time to these three matters occurred, particularly insofar as the work done on the SEC investigation was also useful in the defense of the derivative and class action litigation in order to have the best argument with Aetna about when their first dollar of coverage would kick in."

Q: "Do you recall who raised the issue in the first instance as between BNEC and Ropes and Gray?"

A: "I just don't remember."

The revised billing method was first memorialized in a cover letter sent to BNEC by R & G, dated August 2 1990, which stated in part:

"Pursuant to our discussion last week, I enclose revised June 1990 professional statements that reallocate certain of our charges for services rendered in responding to this summer's SEC subpoena duces tecum. We agree that much of the information that we have gained during the SEC document production is of direct benefit to our defense of the two private actions, and that it is accordingly appropriate for a certain amount of our document production time charges to be reallocated to each of the private suits."

It is clear from both Donovan's deposition and the August cover letter that work done on all three of the actions could have been allocated to the two actions which were covered by insurance, and the Court does not

find anything unusual about R & G's billing conduct in that regard. In addition, the Court notes that the revised billing method was conceived in May 1990, first applied to invoices for June 1990, and first implemented and explained to BNEC in August 1990. The practice continued throughout the preference period. All of these dates precede the preference period which began on October 8, 1990, and therefore the practice during the preference period did not alter the prior course of dealings between the parties.

The payment dated December 29, 1990 in the amount of $82,073.20 was made by the Debtor on behalf of one of its subsidiaries, BNE, N.A. This bill was paid by the Debtor's check, but it was for services rendered to the subsidiary. According to the defendant, although such a legal expense was routinely paid from the Debtor's operating account, it should have been allocated back to BNE, N.A. and is not properly sought by the trustee as a transfer of an interest of the Debtor. The Court finds, however, that the payment represented a transfer of the Debtor's property under 11 U.S.C. § 541 and is rightly a part of the Court's analysis on the instant motion.

■ R & G has sustained its burden of proving the "ordinary course" exception as to nine of the ten challenged payments. However, it has not sustained this burden with respect to the December 29th payment, nor has it sustained its burden of establishing an absence of disputed material facts with regard to this payment.

This payment was made 124 days from the date of its corresponding invoice, or 85.6 days more than the pre-preference average payments. The variation is too high for the Court to accept in the absence of mitigating factors. R & G argues that this payment was delayed because it represented the total bill for work done on a lender liability case for BNE, N.A., and that such bill needed to be approved by a bank officer. R & G also suggests as an explanation that payment was delayed because confusion existed as to which BNEC "cost center" to charge the expense. The trustee disputes both arguments and asserts that no such confusion existed, and even if it did that the 124 day

delay was not consistent with BNE, N.A. payment history. This is a disputed issue of fact which makes summary judgment inappropriate as to this payment.

Conclusion

The Court finds that except for the December 29, 1990 payment, R & G has sustained its burden in its motion for summary judgment. Summary judgment will be entered in favor of R & G as to all payments except the December 29, 1990 payment. A pre-trial conference will be scheduled in the ordinary course with regard to this payment.