**In re 995 FIFTH AVENUE ASSOCIATES, L.P., Debtor.**

**995 FIFTH AVENUE ASSOCIATES, L.P., Plaintiffs–Appellees,**

v.

**NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE, James W. Wetzler as Commissioner of Taxation and Finance, and Edward V. Regan as Comptroller of the State of New York, Defendants–Appellants.**

**No. 90 Civ. 5744 (LBS).**

United States District Court, S.D. New York.

May 16, 1991.

As Amended May 17, 1991.

Angel & Frankel, P.C., New York City (Joshua J. Angel, Leonard H. Gerson, Ira R. Abel, of counsel), for plaintiffs-appellees.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City (Frederic L. Lieberman, David S. Cook, of counsel), for defendants-appellants.

## OPINION

SAND, District Judge.

This case comes to this Court on appeal from an order of the United States Bankruptcy Court for the Southern District of New York, Hon. Tina L. Brozman. The New York State Department of Taxation and Finance, James W. Wetzler, New York Commissioner of Taxation and Finance and Edward V. Regan, Comptroller of the State of New York (collectively "Appellants") appeal from a decision and order granting the motion for summary judgment made by 995 Fifth Avenue Associates, L.P.'s ("Appellees"). Two issues are presented. First, as a jurisdictional matter, Appellants suggest that the Bankruptcy Court acted outside its powers since the relief granted was barred by the Eleventh Amendment and the doctrine of sovereign immunity. Second, Appellants claim that the Bankruptcy Court decision and order should be reversed as a matter of law for exempting Appellees, under provisions of the Bankruptcy Code, from the payment of certain New York State taxes.

The Bankruptcy Court held that the sale by Appellees of its interest in the Stanhope Hotel ("Stanhope") pursuant to a Chapter 11 plan is exempt, under section 1146(c) of Title 11 of the United States Code, 11 U.S.C. § 1146(c) (1988) ("Bankruptcy Code"), from a ten percent tax imposed on gains derived from the transfer of real property by Article 31–B, § 1441 et seq. of the New York tax law ("Gains Tax"). The Bankruptcy Court directed Appellants to refund to Appellees the Gains Tax collected in the amount of $2,608,603.80 together with interest. The Bankruptcy Court further held that Appellants had waived their sovereign immunity and Eleventh Amendment rights with respect to all aspects of the Gains Tax through the filing of a proof of claim by the Commissioner of Taxation and Finance of the State of New York, which asserted a tax liability. For the reasons stated below, the decision and order of the Bankruptcy Court are affirmed.

## I. FACTS

There is little disagreement on the facts in this case. The Appellees were in the business of operating a hotel and related restaurant and catering facilities known as the Stanhope. The Appellees filed a Chapter 11 petition on February 4, 1988 and continued operating the business as debtors-in-possession. Over the course of the bankruptcy case, the Appellees filed an original and three subsequent amended

plans of reorganization (collectively, "the Plan"), all of which contemplated the sale of the Appellees' interest in the Stanhope. On July 20, 1989, the Bankruptcy Court approved the Plan. Shortly thereafter the Stanhope was sold and there was a distribution of funds to the creditors.[1]

Prior to approving the Plan, the Bankruptcy Court issued an order dated November 29, 1988 ("Sale Order"), authorizing the Appellees to sell or assign its interest in the Stanhope for the amount of $76,000,-000. The Sale Order declared that the sale was being made under a plan of reorganization and, pursuant to section 1146(c) of the Bankruptcy Code, would be exempt from any federal, state, or local transfer taxes. The closing of the sale was scheduled for January 13, 1989. On January 12, 1989, pursuant to the pre-transfer audit procedures provided by the New York Tax Law, Appellants issued a Tentative Assessment and Return ("first assessment") imposing a Gains Tax of $2,608,603.80 on the proposed sale and transfer. The Appellees immediately objected to, and were denied by Appellants a reprieve from, the proposed Gains Tax based on section 1146(c) of the Bankruptcy Code. Because state law prohibits recordation of title and transfer in local land records without payment of any tax due, the Appellees paid the Gain Tax under protest to allow the closing to go forward and the deed to be recorded. *See* N.Y. Tax Law § 1447(1)(f)(1) (McKinney 1987).[2]

Since Appellees paid the exact amount of Gains Tax charged in the first assessment, Appellants did not file a proof of claim as to that amount. However, Appellants did file two other proofs of claim in the Bankruptcy Court. Appellants first filed a proof of claim on January 29, 1989 for approximately $3 million to recover sales and withholding taxes. None of these tax-es are challenged in this action and are not relevant to the Gains Tax question. The second proof of claim, filed on October 23, 1989, which is the only claim at issue in this action, was designated the "Third Amended Administrative Expense Claim" ("Claim 300").[3] This claim is based in part on what the Appellants concluded is an additional Gains Tax liability of $2,137,496.76 over and above the $2,608,603.80 already imposed. Claim 300 was filed after the Bankruptcy Court heard oral argument on the summary judgment motion but before it issued an opinion.

## II. DISCUSSION

### A. *Eleventh Amendment and Sovereign Immunity*

Appellants allege as a threshold matter that the Eleventh Amendment and the doctrine of sovereign immunity bar the Bankruptcy Court, and this Court, from considering any portion of this case. Since these immunity defenses are jurisdictional in nature, the Court must first consider their validity. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." At its core, this Amendment stands for the fundamental principle that "sovereign immunity limits the grant of judicial authority in Article III" of the Constitution. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984). Although not explicitly stated by the language in the Amendment, it is a long standing rule that sovereign immunity also bars a citizen from bringing a suit against his or her own State in

---

1. There are still some creditors who have yet to be paid under the Plan and any money deposited in Appellee's account as a result of this action will be distributed according to the Plan. *See* transcript of oral argument, dated February 21, 1991 ("tr.") at p. 3.

2. In conformance with the Plan where a claim is objected to, as in the case of Appellant's claim, the monies at issue are placed in an escrow account maintained by the Appellees. *See* tr. at 3.

3. An Administrative Expense Claim is a type of proof of claim which allows a creditor to move ahead of unsecured creditors to a first or second priority.

federal court. *See Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

■ There are, however, well established exceptions to the reach of the Eleventh Amendment and the doctrine of sovereign immunity. For example, the Supreme Court has held that if a State waives its immunity and consents to suit in a federal court, the Eleventh Amendment does not bar such an action. *See Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 883, 27 L.Ed. 780 (1883).[4] A State may effectuate a waiver of its constitutional immunity by enacting a state statute or constitutional provision, "or by otherwise waiving its immunity to suit in the context of a particular federal program." *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 3145 n. 1, 87 L.Ed.2d 171 (1985). Waiver by participation occurs when a State engages in a federally sponsored activity in which Congress has made waiver of immunity a pre-condition of state participation. *Id.* at 237, 105 S.Ct. at 3144. Still, any consent by the state to waive its Eleventh Amendment rights by participating in a federal program requires an unequivocal and clear indication of such an intention. *See Edelman v. Jordon,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974).

■ The waiver of a State's immunity rights by participation in a bankruptcy proceeding has long been recognized, not only under the Bankruptcy Code, but also under the former Bankruptcy Act. *See Clark v. Barnard,* 108 U.S. 436, 447–48, 2 S.Ct. 878, 883–84, 27 L.Ed. 780 (1883). As the Supreme Court has held, "[w]hen the State becomes the actor and files a claim against the fund, it waives any immunity which it otherwise might have had respecting the adjudication of the claim." *Gardner v. New Jersey,* 329 U.S. 565, 574, 67 S.Ct. 467, 472, 91 L.Ed. 504 (1946). In essence, if a State desires to participate in obtaining remaining assets from a bankrupt estate it is subject, as are all the interested parties, to the requirements imposed by the Bankruptcy Court such as bar dates for filing claims and sale orders.

■ This exception to the Eleventh Amendment and the doctrine of sovereign immunity was codified in section 106(a) of the Bankruptcy Code. Section 106 provides, in pertinent part:

### Waiver of sovereign immunity

(a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occupance out of which such governmental unit's claim arose.

11 U.S.C. § 106(a) (1988).[5] In clear, concise language, Congress conditioned a state's participation in a specific federal program on the state's consent to federal jurisdiction. If a state chooses to enter the federal government's exclusive bankruptcy preserve—to assert a claim against a debtor's estate—it must file a proof of claim, as required of all parties.[6] *See Atascadero*

---

**4.** Another exception is waiver by abrogation. Congress may override Eleventh Amendment immunity by enacting a statute pursuant to its plenary powers granted by the Constitution. For example, Congress has the authority to abrogate a State's immunity pursuant to Section 5 of the Fourteenth Amendment. *See Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Legislative power to abrogate is also available pursuant to Article I under the Commerce Clause. *See Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 2277, 105 L.Ed.2d 1 (1989). It is unclear whether Congress has the power under the Bankruptcy Clause of Article I to abrogate a State's immunity. In *Hoffman v. Connecticut Dep't of Income Maintenance,* 492 U.S. 96, 109 S.Ct. 2818, 2824, 106 L.Ed.2d 76 (1989), the Supreme Court declined to address the question since the case was resolved on other grounds. *Id.* 109 S.Ct. at 2824. *See also Union Gas Co.,* 109 S.Ct. at 2277 (if statutory language does not contain clear expression of intent, constitutional question of Congress's authority to abrogate immunity need not be considered).

**5.** A governmental unit is defined to include the "United States; state; [or] [c]ommonwealth" or any "department, agency or instrumentality thereof." 11 U.S.C. § 101(26) (1988). No party questions that Appellants fall within this definition.

**6.** The language in Section 106(a) refers to a "claim" which is effected in the context of a bankruptcy proceeding by the filing of a "proof of claim."

*State Hospital v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Section 106(a) puts the state on notice that the *quid pro quo* for filing a proof of claim is a partial waiver of its sovereign immunity. This forced partial waiver requires only that a state come into the proceeding on equal terms with others.[7]

■ Once immunity has been waived, the state has subjected itself to any liability it has to the estate relating to the claim and transaction at issue. Section 106(a) "conditions the state's receiv[ing] a distribution from the estate upon waiver of immunity against *any* compulsory counterclaims asserted against it without limit in a bankruptcy proceeding." *In re Willington Convalescent Home, Inc.*, 850 F.2d 50, 54 (2d Cir.1988). *See also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 317 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. As the Second Circuit concluded, "[A]ccordingly, § 106(a) provides for affirmative recovery, including money judgments." *Id. See also In re Prudential Lines, Inc. v. United States Maritime Administration*, 79 B.R. 167, 180 (Bankr.S.D.N.Y.1987); *In re Inslaw, Inc.*, 76 B.R. 224, 234 (Bankr.D.D. C.1987).

■ Here, there is no disagreement that pursuant to section 106(a) Appellants have waived their immunity defenses as to certain claims involving approximately $3 million of sales and withholding taxes by filing a proof of claim on January 29, 1989. The dispute is over the scope of the immunity waived by Appellants upon the later filing of Claim 300, which charges in part that Appellees' estate owes approximately

$2.1 million in additional gains taxes relating to the original Stanhope transaction over and above the approximately $2.6 million already paid. This Court concludes, based on the language in section 106(a), which states in pertinent part that "any claim against such governmental unit ... that arose out of the same transaction or occurrence out of which such government unit's claim arose," that Appellants have waived their immunity defense as to counterclaims involving all gains tax liability related to the Stanhope transaction. All gains tax liability includes both the original 2.6 million Gains Tax and the $2.1 million of additional tax liability outlined in Claim 300 since they are both part of the same claim, arising from the same transaction.

The Appellants advance a three-tiered argument in support of their appeal on this issue. First, they argue that there was no intentional waiver of the State's immunity rights and that filing a proof of claim is not *per se* a waiver. Appellants suggest that since they "vigorously asserted" the immunity defense while filing the proof of claim, *i.e.* Claim 300, and that such filing was a "routine administrative act performed by a mid-level official," that waiver could not have been intended and is inequitable. Appellants' memorandum of law at 35. In essence, Appellants suggest that a filing of a proof of claim by an official is not "the same as a declaration of waiver by an attorney in court" because, in the latter case, "the court may remind the attorney of his client's previous assertions of the defense and inquire [about] ... the actual intent of the client." *Id.*[8]

**7.** This case is not unique in that the filing of a proof of claim may effect the waiver of an otherwise secure constitutional right. Most recently in *Grandfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the Supreme Court held that filing a proof of claim with a bankruptcy court alters a party's Seventh Amendment right to a jury trial. *See also Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).

**8.** In further resisting the conclusion that the State waived any immunity defenses, Appellants suggest that an intentional waiver of sovereign immunity in this instance would have been meaningless since the Gains Tax "had already

been paid." Appellants memorandum of law at 8. Yet, this assertion fails to account for the provisional nature of the tax paid. The amount of the Gains Tax was determined by a Tentative Assessment and Return, issued by the Tax Department. *Id.* at 5. Under New York law, the State has three years from the date of transfer to make an additional Gains Tax assessment on a sale. New York Tax Law § 1444.3(a) (Law. Co-op.1990). Further, Appellants argument does not account for the significant additional revenue the State stood to gain by filing a proof of claim. Claim 300 asserts additional tax liabilities of $2.1 million of Gains Tax based on the same transaction—the sale of the Stanhope.

■ The statutory language does not support Appellants' contention. Under section 106(a), a court is not required to evaluate a governmental unit's intention in asserting a claim against the debtor's estate. Any requirement as to intent is satisfied where the State acts in a way which conforms to the terms of the statute. A court is asked simply to determine whether a claim has been made which arises from the same transaction. *See In re Lile,* 96 B.R. 81, 84 (Bankr.S.D.Tex.1989). The reasoning in *Hoffman,* 109 S.Ct. at 2822, and *Gardner,* 329 U.S. at 574, 67 S.Ct. at 472, likewise, suggest that by filing a proof of claim, a state has offered concrete evidence of its intent to waive any immunity defenses.

Second, Appellants suggest that even if the Court concludes, as it has, that the filing of a proof of claim waives immunity, the statutory language in section 106(a) subjects the State to a very limited waiver of immunity, allowing counterclaims only as to the specific proof of claim filed, which in this case is the approximately $2.1 million of taxes at issue in Claim 300. The problem with this interpretation is that it ignores the language in the statute referring to "any claim ... that arose out of the same transaction." The additional $2.1 million of tax liability arises out of the same Stanhope transaction and is based on a provision of the Gains Tax Law which allows the Appellants to re-evaluate whether the first assessment imposed in the pre-sale audit is sufficient. In order to assert a right against the debtor's estate for additional taxes, involving the same transaction, Appellants must file a proof of claim to effectuate their request for funds under the control of the Bankruptcy Court. As discussed above, this, in essence, requires waiving any immunity defenses as to the claim at issue.

■ A final argument advanced by Appellants is that a waiver of immunity cannot be applied retroactively to affect the Gains Tax paid prior to the sale of the Stanhope. While the Second Circuit has not directly addressed this question, the issue is not one of first impression. In *WJM, Inc. v. Massachusetts Department of Public Welfare,* 840 F.2d 996, 1002–04 (1st Cir.1988), the First Circuit held that a waiver by a state entity was binding, although the filing of a proof of claim occurred some months after the adversary proceedings were concluded, but before the opinion was issued. Factually, *WJM* is on all fours with this action, if not a more difficult case. As the First Circuit recognized, federal medicaid reimbursement law *required* the State of Massachusetts to file a proof of claim to recover any potential overpayment it made. In concluding, nonetheless, that the State had waived any immunity defenses, the court wrote, "we think the waiver should be viewed as having retroactively validated the bankruptcy court's earlier, as well as its subsequent, actions" on the claims. *Id.* at 1004.

This Court concludes that the reasoning in *WJM* is sound and should be followed in this instance. Since the Appellants derived certain benefits from the Bankruptcy Court by potentially retrieving assets that might otherwise have been lost, it would be inequitable to permit the debtors' claims as to the transaction at issue to be frustrated by allowing the State to establish immunity as to a portion of the claim merely by waiting a certain period to file a proof of claim. If this Court were to accept Appellants' arguments, the State would gain all the advantages of the Bankruptcy Court without being subject to its jurisdiction. For this reason, the Court concludes that the significant fact for immunity purposes is that the State filed a proof of claim—not the date that such a filing occurred. As such, Appellants voluntarily waived any immunity defenses on claims involving the Gains Tax liability.

### B. *Transfer or Income Tax?*

■ Turning to the merits we note as a preliminary matter that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 158(a) (1988), since this is an appeal from a final judgment of the Bankruptcy Court rendered in an adversary proceeding. The controversy in this case is whether the Gains Tax paid by Appellees to Appellants, under the New York Tax

Law [9], in order to transfer their interest in the Stanhope pursuant to a Bankruptcy Court Plan, is correctly characterized as an income tax or a transfer tax. The Bankruptcy Code exempts debtors, such as Appellees, pursuant to a plan of reorganization, from all transfer, stamp and similar taxes upon the sale of real property. No such exemption applies for income taxes. Based on the statutory language in the Bankruptcy Code, federal case law, and state and federal tax opinion letters, this Court concludes that the Gains Tax imposed on the income received from the sale of the Stanhope was similar to a transfer or stamp tax. Appellees were therefore entitled to an exemption under the Bankruptcy Code from the New York Gains Tax.

Section 1146(c) of the Bankruptcy Code states, in pertinent part:

> The issuance, transfer, or exchange, of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp or similar tax.

11 U.S.C. § 1146(c) (1988). Congress's apparent purpose in enacting section 1146 was to facilitate reorganizations through the granting of tax relief. According to the legislative history, congressional intent was to give greater relief to debtors than that which was available under section 267 of the Bankruptcy Act. The Report of the House Judiciary Committee stated, "Section 1146(c) of title 11 broadens the exemption to any stamp or similar tax on a security or transfer instrument dealt with under the consolidated chapter 11. No opposition has been voiced with respect to this section." H.R.Rep. No. 595, 95th Cong., 1st Sess. 281 (1977), *reprinted in* 1978 U.S. Code Cong. & Ad.News 5787, 5963, 6238.

The controversy in this action concerns that portion of section 1146(c) which limits exemptions under the Bankruptcy Code to a "stamp or similar tax." At issue is the definition and parameter of a "stamp or similar tax." [10] While the Second Circuit has considered the statutory meaning of certain portions of section 1146(c) of the Bankruptcy Code, including the legal effect of a "transfer under a plan," it has never reached the question of whether the Gains Tax is a "stamp or similar tax." *See City of New York v. Jacoby–Bender, Inc.*, 758 F.2d 840, 841–42 (2d Cir.1985). The only relevant appellate guidance to this case is the Second Circuit Court's rejection in *Jacoby–Bender* of a constricted view of section 1146(c) of the Bankruptcy Code. Focusing upon the practical workings of the exemption, the Court adopted a mode of analysis which suggests a broad reading of this portion of the Bankruptcy Code. *Id.*

The only prior case which specifically addresses whether the Gains Tax constitutes a "stamp or similar tax" is the bankruptcy court decision in *In re Jacoby–Bender, Inc.*, 40 B.R. 10 (Bankr.E.D.N.Y. 1984), *aff'd mem.*, No. 84–1564 (E.D.N.Y. Sept. 18, 1984), *aff'd*, 758 F.2d 840 (2d Cir.1985). There the Bankruptcy Court held that the Gains Tax was akin to an income tax and not exempt under section 1146(c) because it was levied upon only the gain realized by the debtor and not upon the instrument of transfer. [11] In the instant case, the Bankruptcy Court held that the tax was a transfer tax, which is similar to a stamp tax, since it is imposed on a transaction by transaction basis without regard to whether taxpayers realized a gain or suffered a loss from all of its transactions during the relevant period.

---

9. The New York Tax Law states, "A tax is hereby imposed on gains derived from the transfer of real property within the state. The tax shall be at the rate of ten percent of the gain."

10. There is no disagreement in the application of other aspects of section 1146(c). Certainly Appellees have "transferred" a parcel of real property, the Stanhope, and that the sale of the

property was in connection with a confirmed bankruptcy "plan."

11. This portion of the Bankruptcy Court's decision was not addressed by the Second Circuit in *Jacoby–Bender* since New York State had stipulated to return the Gains Tax payment, thereby mooting appellate review. 758 F.2d at 840–42.

While there is little guidance available in determining whether the Gains Tax at issue is a "stamp or similar tax" within the meaning of the Bankruptcy Code, the Court is not without some guideposts. In other contexts, federal courts have identified the characteristics relevant to determining whether a particular levy by the state is a stamp tax. There are three common elements present in all stamp taxes. First, the tax is imposed only upon a transfer or sale of the item at issue. Second, the amount of tax due is determined by the consideration recited in the deed of the transfer. Finally, the taxes must have been paid as a prerequisite to recording. *See Lee v. Bickell*, 292 U.S. 415, 417, 54 S.Ct. 727, 728, 78 L.Ed. 1337 (1934) (stamp tax placed on original issue and transfer or sale of stocks and bonds); *Texaco, Inc. v. United States*, 624 F.2d 20, 21 (5th Cir. 1980) (federal stamp tax on deeds by which realty is transferred).[12]

Applying these general criteria, the Second Circuit analysis of section 1146(c) outlined in *Jacoby*, and congressional intent to give greater tax relief to debtors, we conclude that the essential stamp tax characteristics are present in the Gains Tax. First, the tax is imposed on a transaction by transaction basis, payable on transfer, without regard for other transfers made over a given time. Second, the consideration paid to the transferor and recited in the instrument, *i.e.*, the deed, plays an essential role in assessing the amount of Gains Tax due. In fact, the primary considerations are the acquisition cost and the sale cost.[13] Finally, the Gains Tax must be paid at the time of transfer, as state law prohibits recording of the conveyance until this act is done. *See* N.Y. Tax Law § 1447(1)(f) (McKinney 1987). Failure to record makes null and void the conveyance of real property to a subsequent purchaser who acquires the property in good faith and for valuable consideration. *See* N.Y. Real Property Law § 291 (McKinney 1989). It was for precisely this reason that Appellees paid the Gains Tax assessed, rather than awaiting an outcome of the matter in the Bankruptcy Court.

There are other factors that indicate that the New York Tax Law is a transfer or stamp tax based on the transfer of real property rather than on the income generated thereby. First, the original purchase price is not adjusted to reflect depreciation cost deductions allowed in the operation of commercial real estate. Without this adjustment for depreciation, the Gains Tax is not based on a true measure of accrued wealth, as would be the case for calculating gain for income tax purposes. Second, the Gains Tax is not assessed against all profitable transactions. Only those transfers in which the consideration exceeds $1,000,000 are subject to this tax. There is no Gains Tax imposed until this amount is exceeded, at which point the entire gain is taxed at ten percent, not merely that portion of the gain exceeding $1,000,000. Third, unlike income tax liability, the transferee is secondarily liable for the amount owed if the transferor does not pay the Gains Tax. In toto, the result is the taxation of a certain class of transfers and not the taxation of a certain class of income.

This interpretation is also consistent with both federal and state revenue rulings. The State of New York has made certain revenue rulings with respect to the Gains Tax concluding that it is a transfer tax rather than an income tax. On September 21, 1983, the Tax Department found:

---

**12.** Stamp taxes may have characteristics such as actual stamps on the written instrument to show that a tax has been paid. The absence of an actual stamp, however, is not necessarily determinative that the tax paid is not a stamp tax or similar type tax. *See Jacoby–Bender, Inc.*, 40 B.R. at 10.

**13.** Certain statutorily permitted adjustments (including certain capital improvements and fees paid to brokers, surveyors, engineers and attorneys) are added to the transferor's original purchase price and then subtracted from the consideration received for the transfer. *See generally* N.Y.Tax Law § 1440(5) (McKinney 1987); 20 N.Y.Comp.Codes R. & Regs., § 590.14–17 (1988).

The State gains tax is a transfer tax rather than a property or income tax since the triggering mechanism of the tax is the transfer of real property. Whereas the gains tax is a tax upon the transfer of real property, a property tax is a levy on the property itself. Income taxes are generally applied to net gain. Under the gains tax, the loss from one transfer of real property does not effect the applicability of the gains tax as to another transfer of real property in the same tax year. For these reasons, it is our opinion the State gains tax should be classified as a State transfer tax and should be treated as such for purposes of deductibility.

*See Appendix A.* A few months later, in another letter describing the Gains Tax and reiterating their prior position, the State wrote, "the tax is classified by New York as a transfer tax ... because it is triggered by the transfer of the property, not by other incidents of ownership." *See Appendix B.*

In both of these rulings, the State was influenced by Internal Revenue Service ("IRS") ruling 80–121 which held that a gains tax in Vermont, similar to the Gains Tax, was a transfer and not an income tax for federal tax purposes. The IRS took this position primarily because the Vermont State tax was not structured to account only for net gain. Under the Vermont tax, as under the Gains Tax, a taxpayer could make two transfers on the same day, one earning $1,000,000 and the other loosing $1,000,000 so that at the end of the day there has been no net increase in wealth. Nonetheless, the taxpayer would be liable for the gains tax on the profitable transaction and could not offset losses. Furthermore, the Vermont gains tax did not allow for depreciation or other types of costs usually associated with arriving at the economic net gain. In order for IRS to characterize a tax as an income tax under section 164(a)(3) of the Internal Revenue Code, a taxpayer must be allowed to reduce taxable gains by any losses experienced during the same tax year and to deduct depreciation costs.

Appellants suggest that these tax opinions are merely advisory and are not binding on New York with respect to this debtor. The only estoppel effect these opinions have, according to Appellants, is with respect to the parties who made the requests for the advice. *See* 20 N.Y.Comp.Codes R. & Regs. § 901.4 (1988). Moreover, the Appellants argue that these rulings do not suggest that the Gains Tax is a stamp tax. Rather, Appellants urge that a stamp tax is an excise tax which is imposed on such events as the drawing of a will, deed or mortgage recordings and taxes on such goods as cigarettes and liquor. According to the Appellants the transfer of the Stanhope is not akin to the types of events and goods upon which a stamp is affixed.

Appellants' arguments are unavailing. First, while the state tax rulings are not binding on this Court, they are persuasive evidence that the Gains Tax is not an income tax. Moreover, Appellants' suggestion that the stamp tax should be narrowly understood as applying only to a few events is equally unpersuasive. This argument fails to account for the statutory language of section 1146(c) which does not limit the tax exclusion only to a stamp tax. Section 1146(c) exempts "a stamp or *similar tax*" (emphasis added). Since the Gains Tax has many of the characteristics of a stamp tax and few of the qualities of an income tax, this Court concludes that Appellees were entitled to an exemption under section 1146(c) of the Bankruptcy Code since the Gains Tax is a "stamp or similar tax."

The Opinion and Order of the Bankruptcy Court are affirmed.

SO ORDERED.

APPENDIX A

State of New York
Department of
TAXATION and FINANCE
·Albany, New York 12227

Law Bureau
State Campus,
Albany, New York 12227

September 21, 1983

Dear            :

        This letter is in reply to your inquiries of June 9 and June 27, 1983 concerning Article 31-B of the Tax Law, the New York Real Property Transfer Gains Tax.  You had questions as to the treatment of the tax for State corporate franchise and personal income tax purposes, and as to how the "acquisition of controlling interest" provisions of the tax are to be applied.

        -In order to determine the deductibility of the gains tax for corporate franchise and personal income tax purposes, the tax must first be classified.  The New York State Real Property Transfer Gains Tax is a levy on gains derived from the transfer by any method of an interest in real property located in New York where the consideration is one million dollars or more.

        The State gains tax is a transfer tax rather than a property or income tax since the triggering mechanism of the tax is the transfer of real property.  Whereas the gains tax is a tax upon the transfer of real property, a property tax is a levy on the property itself.  Income taxes are generally applied to net gain.  Under the gains tax, the loss from one transfer of real property does not effect the applicability of the gains tax to another transfer of real property in the same tax year.  For these reasons, it is our opinion that the State gains tax should be classified as a State transfer tax ·and should be treated as such for purposes of deductibility.

        It should be noted, however, that though the Department's views are expressed herein, the Internal Revenue Service will ultimately determine the deductibility of the gains tax for Federal tax purposes, and that State tax policy is usually formulated in accordance with the Federal treatment of the tax.  It is our opinion, in light of Revenue Ruling 80-121, that the Internal Revenue Service will classify the gains tax as being a transfer tax.  In that ruling, Vermont's land gains tax, as imposed by sections 10001 through 10010, Title 32, of the Vermont Statutes Annotated, was deemed to be a transfer tax.  The Vermont land gains tax is conceptually similar to New York's gains tax in that the Vermont statute levies a tax on gain from the sale or exchange of

land. Under their statute, a sale or exchange of land is any transfer of title to land for a consideration, and taxable gain is the amount realized from a sale or exchange of land, less the transferor's basis in the land.

Section 164(a) of the Internal Revenue Code describes various types of taxes that are allowed as a deduction for the taxable year within which paid or accrued. Specifically allowed are: (1) State and local real property taxes; (2) State and local personal property taxes; (3) State and local income taxes; and (4) State and local general sales taxes. Section 164(a) of the Code also allows, as a deduction, State and local taxes not specifically described that are paid or accrued within the taxable year in carrying on a trade or business or an activity described in section 212 (relating to expenses for the production of income).

In determining that the Vermont land gains tax is a transfer tax, Revenue Ruling 80-121 first distinguished other forms of taxes as not being applicable. The Ruling provides, in pertinent part, as follows:

"The Vermont land gains tax is not imposed or triggered by the ownership of real property, but rather, by the exercise of one of the incidents of property ownership, the transfer of real property at a gain. The land gains tax is not measured by the value of the real property, but rather, by the gain derived from the transfer of that property . . . . Thus, the land gains tax is not a real property tax within the meaning of section 164(a)(1) of the Code."

With respect to the Vermont land gains tax qualifying as a State income tax within the meaning of section 164(a)(3) of the Code, the Revenue Ruling distinguishes the land gains tax from Federal income taxes, stating that the State tax, unlike the Federal income tax, is not structured to fall on net gain. The taxpayer, as a result of the gains tax, cannot reduce taxable gain from sales or exchanges of land during the taxable year by any losses from other sales or exchanges of land during that year. Under Federal income tax law, taxpayers are allowed to reduce gains from sales or exchanges of land by losses from sales or exchanges of land. Noting that a taxpayer could be required to pay the land gains tax even though under Federal income tax laws that same taxpayer may have a net loss from sales or exchanges of land, the ruling concluded that the tax is not an income tax under section 164(a)(3) of the Code.

In light of Revenue Ruling 80-121, it is the Department's opinion that the New York State Real Property Transfer Gains Tax is a transfer tax, and for purposes of Federal deductibility, the tax is deductible for purposes of computing adjusted gross income under section 164(a) of the Internal Revenue Code only to the extent that it is paid or accrued within the taxable year in carrying on a trade or business, or in connection with an activity described in section 212 of the Internal Revenue Code relating to expenses for the production of income.

For State income tax purposes, section 612 of the Tax Law provides that the New York adjusted gross income of a resident individual means his Federal adjusted gross income, with certain modifications. Since the State gains tax will be deductible for purposes of computing Federal adjusted gross income, it will automatically be excluded from the computation of New York adjusted

gross income, since there is no provision in the Tax Law adding back such amounts for purposes of such computation. A similar provision is found in Article 9-A of the Tax Law, the corporate franchise tax. Section 208 defines "entire net income" to mean total net income from all sources, which shall be presumably the same as the entire taxable income which the taxpayer is required to report to the United States Treasury Department. Since the State gains tax will be deducted from the taxable income the taxpayer is required to report to the United States Treasury Department, the tax will automatically be excluded from the computation of the state franchise tax since there is no provision adding it back for purposes of computing entire net income.

With regard to your inquiry as to how the acquisition of controlling interest provisions of the tax are to be applied, one must look to what is acquired, not to what is maintained. The tax is imposed on gains from the transfer of any interest in real property, which is defined to include "acquisition of a controlling interest" in any entity with an interest in real property. (Tax Law, § 1440.7) The term "controlling interest" is defined in section 1440.2 of the Tax law to mean:

> "(i)  in the case of a corporation, either fifty percent or more of the total combined voting power of all classes of stock of such corporation, or fifty percent or more of the capital, profits or beneficial interest in such voting stock of such corporation, and
> (ii)  in the case of a partnership, association, trust or other entity, fifty percent or more of the capital, profits or beneficial interest in such partnership, association, trust or other entity."

The key term in these provisions is "acquisition". For purposes of the gains tax, if no partner acquires a controlling interest in the partnership, there is no transfer subject to the tax. In the case of a corporation which has an interest in real property, the acquisition of a controlling interest in the corporation occurs when an individual, group of individuals acting in concert to avoid the tax, or another entity becomes the owner of 50% or more of the voting stock in such corporation. Because the statute looks to the acquisition of the controlling interest, it is the act of the transferee which triggers the tax.

For your further information, I am enclosing a copy of Publication 588 containing questions and answers on the gains tax or real property transfers.

Very truly yours,

JOHN P. DUGAN
Deputy Commissioner and Counsel

TWS/cjm
Enclosure

APPENDIX B

State of New York
Department of
TAXATION and FINANCE
Albany, New York 12227

Law Bureau
State Campus,
Albany, New York 12227

November 14, 1983

Dear        :

     This letter is in response to your inquiry of September 23, 1983 regarding Article 31-B of the Tax Law, The New York Real Property Transfer Gains Tax. You asked whether the payment of tax pursuant thereto would avail the taxpayer of a credit or deduction for partnership or individual income tax purposes. It is our opinion that, if anything, a deduction would be allowed.

     The treatment of taxes for such purposes largely depends upon the classification of the tax. Comparably classified taxes generally receive similar deduction treatment. The New York State Real Property Transfer Gains Tax is a levy on gains derived from the transfer by any method of an interest in real property located in New York where the consideration is one million dollars or more.

     The tax is classified by New York as a transfer tax rather than a property tax because it is triggered by the transfer of the property, not by other incidents of ownership, and not levied on the land itself.

     It should be noted, however, that though the Department's views are expressed herein, the Internal Revenue Service will ultimately determine the deductibility of the gains tax for Federal tax purposes, and that State tax policy is usually formulated in accordance with the Federal treatment of the tax. It is our opinion, in light of Revenue Ruling 80-121, that the Internal Revenue Service will classify the gains tax as being a transfer tax. In that ruling, Vermont's land gains tax, as imposed by sections 10001 through 10010, Title 32, of the Vermont Statutes Annotated, was deemed to be a transfer tax. The Vermont land gains tax is conceptually similar to New York's gains tax in that the Vermont statute levies a tax on gain from the sale or exchange of land. Under their statute, a sale or exchange of land is any transfer of title to land for a consideration, and taxable gain is the amount realized from a sale or exchange of land, less the transferor's basis in the land.

     Section 164(a) of the Internal Revenue Code describes various types of taxes that are allowed as a deduction for the taxable year within which paid or accrued. Specifically allowed are: (1) State and local real property taxes; (2) State and local personal property taxes; (3) State and local income taxes; and (4) State and local general sales taxes. Section 164(a) of the Code also allows, as a deduction, State and local taxes not specifically described

that are paid or accrued within the taxable year in carrying on a trade or business or an activity described in section 212 (relating to expenses for the production of income).

In determining that the Vermont land gains tax is a transfer tax, Revenue Ruling 80-121 first distinguished other forms of taxes as not being applicable. The Ruling provides, in pertinent part, as follows:

"The Vermont land gains tax is not imposed or triggered by the ownership of real property, but rather, by the exercise of one of the incidents of property ownership, the transfer of real property at a gain. The land gains tax is not measured by the value of the real property, but rather, by the gain derived from the transfer of that property . . . . Thus, the land gains tax is not a real property tax within the meaning of section 164(a)(1) of the Code."

With respect to the Vermont land gains tax qualifying as a State income tax within the meaning of section 164(a)(3) of the Code, the Revenue Ruling distinguishes the land gains tax from Federal income taxes, stating that the State tax, unlike the Federal income tax, is not structured to fall on net gain. The taxpayer, as a result of the gains tax, cannot reduce taxable gain from sales or exchanges of land during the taxable year by any losses from other sales or exchanges of land during that year. Under Federal income tax law, taxpayers are allowed to reduce gains from sales or exchanges of land by losses from sales or exchanges of land. Noting that a taxpayer could be required to pay the land gains tax even though under Federal income tax laws that same taxpayer may have a net loss from sales or exchanges of land, the ruling concluded that the tax is not an income tax under section 164(a)(3) of the Code.

In light of Revenue Ruling 80-121, it is the Department's opinion that the New York State Real Property Transfer Gains Tax is a transfer tax, and for purposes of Federal deductibility, the tax is deductible for purposes of computing adjusted gross income under section 164(a) of the Internal Revenue Code only to the extent that it is paid or accrued within the taxable year in carrying on a trade or business, or in connection with an activity described in section 212 of the Internal Revenue Code relating to expenses for the production of income.

For State income tax purposes, section 612 of the Tax Law provides that the New York adjusted gross income of a resident individual means his Federal adjusted gross income, with certain modifications. Since the State gains tax will be deductible for purposes of computing Federal adjusted gross income, it will automatically be excluded from the computation of New York adjusted gross income, since there is no provision in the Tax Law adding back such amounts for purposes of such computation. A similar provision is found in Article 9-A of the Tax Law, the corporate franchise tax. Section 208 defines "entire net income" to mean total net income from all sources, which shall be presumably the same as the entire taxable income which the taxpayer is required to report to the United States Treasury Department. Since the State gains tax will be deducted from the taxable income the taxpayer is required to report to the United States Treasury Department, the tax will automatically be excluded from the computation of the state franchise tax since there is no provision adding it back for purposes of computing entire net income.

For your further information, I am enclosing a copy of Publication 588 containing questions and answers on the gains tax or real property transfers.

Very truly yours,

JOHN P. DUGAN
Deputy Commissioner and Counsel

LMP:pbc
Enclosure