In re DOOLEY PLASTICS CO., INC., Debtor.

Stephen S. GRAY, Chapter 7 Trustee, Plaintiff,

v.

HUNTSMAN CHEMICAL CORP., Defendant.

Bankruptcy No. 92–16710–JNF. Adv. No. 94–1354.

United States Bankruptcy Court, D. Massachusetts.

Aug. 2, 1995.

Robert J. Shea, Coffey & Shea, Boston, MA, for plaintiff Chapter 7 Trustee.

M. Ellen Carpenter, Kern, Sosman, Hagerty, Roach & Carpenter, Boston, MA, David R. Williams, Woodbury & Kesler, P.C., Salt Lake, UT, for defendant Huntsman Chemical Corp.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matters before the Court are cross-motions for summary judgment. Stephen S. Gray, the Chapter 7 Trustee (the "Trustee"), seeks judgment against Huntsman Chemical Corp. ("Huntsman") on his complaint to avoid certain preferential transfers pursuant to 11 U.S.C. § 547(b).[1] Huntsman seeks summary judgment in its favor with respect to its asserted defenses to the complaint under 11 U.S.C. §§ 547(c)(1), (2), and (4) and 553(a). If Huntsman were to succeed, the Trustee would be precluded from avoiding any preferential transfers.

The Court heard the cross-motions on June 22, 1995. At the hearing, Huntsman conceded that the Trustee had established that it received preferential payments in the sum of $47,610.00 based upon the affidavit of Paul Wishengrad, a certified public accountant, with respect to the sections 547(b)(3) and (b)(5)(A)–(C). In its answer to the Trustee's complaint, Huntsman had admitted allegations pertinent to subsections 547(b)(1), (2), and (4).

This Court may enter summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

---

**1.** Section 547(b) provides in relevant part the following:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—

(A) on or within 90 days before the date of the filing of the petition; ... and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R.Civ.P. 56(c), made applicable to this proceeding by Fed.R.Bankr.P. 7056. With respect to the Trustee's motion, Huntsman admitted at the June 22, 1995 hearing that there were no facts in dispute.[2] Accordingly, the Court shall enter summary judgment in favor of the Trustee. Huntsman's defenses cannot be resolved so readily as the following analysis shall demonstrate.

## II. FACTS

The parties have filed a "Joint Statement of Uncontested Facts." The Court finds the following facts based upon the Joint Statement of the parties, as well as the evidentiary materials submitted by the parties in support of their respective motions for summary judgment.

Dooley Plastics Co., Inc. ("Dooley" or the "Debtor") was in the business of brokering the sale of expanded polystyrene ("EPS"), commonly known as Styrofoam. It purchased EPS manufactured by Huntsman and arranged for its sale to various businesses. The Debtor received a commission from Huntsman based upon the number of pounds of EPS it sold. W.R. Grace was one of Dooley's largest accounts. At all material times, Huntsman shipped EPS directly to W.R. Grace and billed Dooley for each shipment. At the time of the filing of the Debtor's bankruptcy petition, Dooley owed Huntsman approximately $914,000.00.

Dooley and Huntsman began doing business in 1986. At the outset, they dealt with each other under ordinary business terms, which in the plastics industry consisted of shipping products on credit with payment due sixty days after the date of invoice. By July of 1989, Dooley was behind in its payments to Huntsman. By January 22, 1991, at least 22 of Huntsman's invoices to Dooley were more than sixty days old. This situa-

tion deteriorated steadily until the time the Debtor filed its bankruptcy petition when virtually all of Huntsman's invoices were more than one year old. Despite numerous repayment plans to which the Debtor agreed and then invariably breached, and, despite numerous warnings that shipments would be cut off and legal action undertaken, Huntsman was unable to substantially improve its credit relationship with the Debtor. Having obtained a credit report on Dooley in July of 1991, Huntsman was aware that legal action would not yield a substantial reduction in the amount of its outstanding invoices. Huntsman's Director of Credits and Collections, Raymond J. McAtee ("McAtee"), made the informed decision to work with the Debtor to reduce the outstanding invoices rather than to initiate collection efforts through legal action. Working with the Debtor entailed constant communications with the Debtor's principals to encourage compliance with the various repayment schedules undertaken during the course of the relationship, coupled with repeated, but less than dire, threats of shipment terminations and legal action.

Approximately one year prior to the bankruptcy filing, in August of 1991, Huntsman proposed that the Debtor's principals, Frank and Rosemarie Dooley, execute an interest bearing note and personal guarantees of the Debtor's outstanding obligations to Huntsman. The Dooleys refused this request. Around the same time, the Debtor began sending Huntsman post-dated checks. On September 23, 1991, Huntsman unilaterally altered its payment agreement with Dooley: before Huntsman would release a new shipment, Dooley would have to pay on its account an amount equal to the price of the new shipment plus $5,000.00 per week to reduce the old balance. The Debtor agreed to this arrangement, except that it asked for five-day credit terms for payment of the new shipments, a concession to which Huntsman

---

**2.** In its memorandum that accompanied its motion for summary judgment, Huntsman argued that the commission credits were not property of the debtor and therefore did not satisfy section 547(b)'s requirement that there be a "transfer of the interest of the debtor in property." The Court finds that Huntsman waived this argument

by conceding the existence of preference payments at the June 22, 1995 hearing. Alternatively, the Court rejects this argument. A similar argument was considered and rejected in *WJM, Inc. v. Massachusetts Department of Public Welfare,* 840 F.2d 996, 1007–1009 (1st Cir.1988).

agreed, as long as the post-dated check problem was resolved.

Although the post-dated check problem was never resolved (as of May 11, 1992, post-dated checks totalled approximately $80,-000.00), Dooley began to make the $5,000.00 payments and Huntsman extended credit to Dooley for new shipments on 5–day terms. The following chart summarizes the Debtor's track record with respect to the $5,000.00 payments, as well as McAtee's reminders (via fax) that the payments were not being received as promised.

| PAYMENT DATE | AMOUNT PAID | DATE OF FAX RE: PAYMENTS |
|---|---|---|
| 10/23/91 | $5,000 | |
| 10/31/91 | $5,000 | |
| 11/08/91 | $5,000 | |
| 11/15/91 | $5,000 | |
| 11/25/91 | $5,000 | 11/22/91 |
| 11/26/91 | $5,000 | |
| 12/09/91 | $5,000 | |
| 12/13/91 | $5,000 | |
| 12/20/91 | $5,000 | |
| 12/26/91 | $5,000 | 01/21/92 |
| 01/07/92 | $5,000 | |
| 01/10/92 | $5,000 | |
| 01/24/92 | $10,000 | |
| 01/31/92 | $5,000 | |
| 02/18/92 | $5,000 | 02/07/92, 02/11/92 |
| 08/05/92 | $5,000 | |
| 03/13/92 | $5,000 | 03/06/92 |
| 03/27/92 | $5,000 | 03/25/92 |
| 04/03/92 | $5,000 | |
| 04/10/92 | $5,000 | 04/06/92 |
| 04/20/92 | $5,000 | |
| 04/30/92 | $5,000 | 04/24/92 |
| 04/30/92 | $5,000 | |
| 05/15/92 | $5,000 | 05/08/92, 05/13/92, 05/26/92, 05/29/92, 06/04/92, 06/19/92, 06/30/92 |

With respect to the commission component of the Trustee's preference claim, Huntsman initially applied commission credits to Dooley's outstanding account on a quarterly basis. Beginning in the spring of 1992, at around the same time it began billing W.R. Grace directly, Huntsman began to credit the Debtor's account monthly. The commission credits earned during the preference period totalled $17,610.00. The parties agreed that Dooley earned the following credits in the fall and spring prior to the filing of the bankruptcy petition:

| DATE | AMOUNT CREDITED | DESCRIPTION |
|---|---|---|
| 10/15/91 | $1,260.00 | COMM. FOR 06/15/91 SHIP. TO W.R. GRACE |
| 10/15/91 | $1,260.00 | COMM. FOR 08/23/91 SHIP. TO W.R. GRACE |
| 10/15/91 | $1,260.00 | COMM. FOR 08/28/91 SHIP. TO W.R. GRACE |
| 10/15/91 | $1,260.00 | COMM. FOR 08/30/91 SHIP. TO W.R. GRACE |
| 10/15/91 | $1,260.00 | COMM. FOR 09/10/91 SHIP. TO W.R. GRACE |
| 10/15/91 | $1,260.00 | COMM. FOR SHIP. TO W.R. GRACE PRIOR TO 09/17/91 |
| 03/30/92 | $10,080.00 | COMM. FOR SHIP. TO W.R. GRACE FOR 1ST QUARTER 1992 |
| 04/30/92 | $8,820.00 | COMM. FOR SHIP. TO W.R. GRACE FOR 4/92 |
| 06/03/92 | $2,520.00 | COMM. FOR SHIP. TO W.R. GRACE FOR 5/92 |
| 07/01/92 | $11,280.00 | COMM. FOR SHIP. TO W.R. GRACE FOR 6/92 |

This commission schedule differs from one that appears in the Trustee's motion for summary judgment. In his motion, the Trustee sets forth the following schedule:

| SHIPMENT DATE | COMMISSION |
|---|---|
| 04/01/92 | $2,520.00 |
| 04/03/92 | $6,300.00 |
| 05/19/92 | $3,780.00 |
| 05/21/92 | $1,230.00 |
| 06/09/92 | $3,780.00 |
| TOTAL | $17,610.00 |

Since the Trustee did not reference either a deposition or an affidavit, the Court is unable to find that the Trustee's shipment chronology represents an undisputed fact, particularly as the commissions attributable to the month of May are $2,520.00 per the undisputed chart and $5,010.00 per the Trustee's chart.

## III. DISCUSSION

Upon review of the undisputed facts, the Court discerns the following pertinent issues: 1) whether Huntsman has established that the Debtor's payments and credits were "made according to ordinary business terms," see 11 U.S.C. § 547(c)(2)(C); 2) whether Huntsman has established that the payments and credits were intended to be and in fact were contemporaneous exchanges for new value, see id. § 547(c)(1); 3) whether Huntsman gave new value to or for the benefit of the Debtor that did not result in the Debtor making "an otherwise unavoidable transfer to or for the benefit of" Huntsman, see id. § 547(c)(4); and 4) whether Huntsman has established that it did not incur its obligation to the Debtor for commissions within the 90 days preceding the Debtor's bankruptcy "for the purpose of obtaining a right of setoff," see id., § 553(a)(3). Huntsman has the burden of proving each of its defenses to the Trustee's preference claim, see id. § 547(g), as well as its right to setoff under section 553(a), see In re Fairfield

*Plantation, Inc.,* 147 B.R. 946 (Bankr. E.D.Ark.1992).

### A. *Ordinary Business Terms*

■ In *WJM, Inc. v. Massachusetts Department of Public Welfare,* 840 F.2d 996, 1010 (1st Cir.1988), the Court of Appeals for the First Circuit determined that since subsection 547(c)(2) was written in the conjunctive, each of its elements must be established by a preference defendant raising the ordinary course of business defense.[3] Assuming that Huntsman has submitted sufficient evidence with respect to the first two elements of subsection 547(c)(2), this Court finds that evidence with respect to the third and final element of the defense is lacking.

■ In the years after *WJM,* several circuit courts have addressed the meaning of the phrase "made according to ordinary business terms" found in section 547(c)(2)(C). A majority of them have determined that the Bankruptcy Code, which fails to define any of the phrases in section 547(c)(2), requires an objective analysis. *See, e.g., Advo–System, Inc. v. Maxway Corp. (In re Maxway Corp.),* 37 F.3d 1044 (4th Cir.1994); *Sulmeyer v. Pacific Suzuki (In re Grand Chevrolet, Inc.),* 25 F.3d 728, 733 (9th Cir.1994); *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.),* 18 F.3d 217, 223–26 (3d Cir.1994); *Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners),* 12 F.3d 1549, 1553 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994); *Jones v. United Sav. & Loan Ass'n. (In re U.S.A. Inns of Eureka Springs, Ark.),* 9 F.3d 680, 683–84 (8th Cir.1993); *In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029, 1032–33 (7th Cir. 1993); *Logan v. Basic Distrib. Corp. (In re Fred Hawes Org.),* 957 F.2d 239, 243–44 (6th Cir.1992). *But see Marathon Oil Co. v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563, 1565 (11th Cir.1986) (using a subjective analysis

for subsection 547(c)(2)(C) as well as subsection 547(c)(2)(B)). Generally, these cases require that a preference defendant must establish that "the payment terms are not unusual when compared with the prevailing standards in the creditor's industry" in order to meet the test under section 547(c)(2)(C). *See Advo–System,* 37 F.3d at 1047.

In *Advo–System,* the Court of Appeals for the Fourth Circuit, with the benefit of what it described as "two well-reasoned panel decisions from the Seventh and Third Circuits," elaborated on how to determine the relevant industry and how much of a departure from that industry's norm would be allowed for purposes of subsection 547(c)(2)(C). Following a thoughtful analysis, which this Court shall not repeat, the court adopted the approach articulated by the Third Circuit, which embellished the Seventh Circuit's rule:

> '[W]e read subsection C as establishing the requirement that a creditor prove that the debtor made its pre-petition preferential transfer in harmony with the range of terms prevailing as some relevant industry's norms. That is, subsection C allows the creditor considerable latitude in defining what the relevant industry is, and even departures from that relevant industry's norms which are not so flagrant as to be "unusual" remain within subsections C's protection. In addition, when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C.'

*Advo–System,* 37 F.3d at 1050 (quoting *Molded Acoustical,* 18 F.3d at 226).

Having adopted this standard, the court applied it to the facts of the case in which the

---

**3.** Section 547(c)(2) provides the following:
(c) The trustee may not avoid under this section a transfer.—
  (2) to the extent that such transfer was—
  (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms....
11 U.S.C. § 547(c)(2).

relevant industry was that of the preference defendant, Advo, a nationwide direct mail marketer. The Court assumed for the purpose of its ruling that Advo's relationship with the Debtor was steady and well-established and that the preference payments were consistent with credit terms used by the parties in their prior course of dealing. The court ruled that Advo could not survive a motion for summary judgment because it submitted no evidence "on the credit terms it normally extended to its other customers." 37 F.3d at 1050. The court found that Advo characterized the industry norm at "too high a level of generality" when it relied upon the proposition that its norm was " 'to work with its customers and [to] extend credit to some customers . . . instead of requiring pre-payment.' " *Id.* The court implied that the test under section 547(c)(2)(C) could only be met by the introduction of evidence relative to "specific credit terms representative of . . . [the] . . . norm, e.g., the manner, form, amount, and timing of its customers' credit payments. . . ." *Id.* And, it ruled that section 547(c)(2)(C) could not be satisfied by the assertion that the industry norm is to extend credit, stating the following:

> Preference payments are by definition credit payments and therefore would never be unusual vis-a-vis that proffered norm. Yet within that same industry there likely would be a range of credit terms that one would consider to be normal. . . . If a preference payment's terms do not fit within that normal range of credit terms (e.g., a preference payment made 100 days after receipt of an invoice), then the preference payment would fail subsection C notwithstanding that the extension of credit would not itself be unusual. Such a preference payment may 'hasten bankruptcy by alarming other creditors and motivating them to force the debtor into bankruptcy to avoid being left out.'

4. Huntsman cited this case in support of its argument under section 547(c)(2)(B). However, for purposes of Huntsman's motion for summary judgment, the Court finds that the issues raised by section 547(c)(2)(C) are decisive.

5. Section 547(c)(1) provides the following:

*Id.* (quoting *In re Meridith Hoffman Partners,* 12 F.3d at 1553).

Huntsman's evidence of the ordinary business terms suffers from the same infirmity as that in *Advo–System,* namely too high a level of generality. While McAtee indicated that Huntsman had similar workout arrangements with other customers whose accounts were delinquent and that such arrangements are common for collecting delinquent accounts in the plastics industry, this Court lacks evidence as to the number of distributors Huntsman utilized, the number of Huntsman's delinquent accounts, the amount of credit usually extended to account debtors, and the frequency of workout arrangements with account debtors with invoices in excess of four months old. Without this evidence, the Court cannot allow Huntsman's motion for summary judgment with respect to its subsection 547(c)(2) defense, even assuming payments were made in the ordinary course of business between Huntsman and Dooley. *See First Software Corp. v. Micro Education Corp. (In re First Software Corp.),* 103 B.R. 359 (D.Mass.1988).[4]

With respect to the commissions, this Court further notes that the commissions earned by Dooley were ordinarily applied to reduce the Debtor's account balance with Huntsman quarterly. However, in the months before the bankruptcy filing, Huntsman applied the credits monthly, in a departure from the ordinary course of business between the parties that coincided with Huntsman's decision to directly invoice W.R. Grace for shipments. Accordingly, the Court is unable to find that Huntsman sustained its burden under section 547(c)(2) with respect to the commissions.

### B. Contemporaneous Exchange for New Value

■ With respect to Huntsman's defense under subsection 547(c)(1),[5] this Court rules

(c) The trustee may not avoid under this section a transfer—
> (1) to the extent that such transfer was—
> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> (B) in fact a contemporaneous exchange. . . .

that the defense fails. Huntsman has failed to clearly articulate what constituted new value [6] and when the new value was given. Assuming that the new value was the shipment of goods to W.R. Grace, the new value was not given to the Debtor. Assuming the new value was the extension of credit, it is unclear whether the Debtor or W.R. Grace was given the credit because of the change in billing practices.

Huntsman argues that its agreement with Dooley was such that it would ship a new load of material on five-day credit terms for each $5,000.00 payment received from Dooley. In other words, each payment of $5,000.00 enabled Dooley to credit for a new load of material.

The Trustee argues that the $5,000.00 periodic payments were neither contemporaneous exchanges nor exchanges for new value. Since he is not seeking to recover the payments for product shipped on five-day terms, the Trustee argues that the $5,000.00 payments were intended to pay down the outstanding invoices that were more than 120 days old and that payments toward such old invoices could hardly be said to be contemporaneous. Most importantly, the Trustee notes that Huntsman dropped Dooley out of the loop sometime in the spring of 1992 and both shipped and billed W.R. Grace directly. According to the Trustee, the new value then went to W.R. Grace, not Dooley, and W.R. Grace, not Dooley, paid for product in a contemporaneous exchange.

The Court finds that the Trustee's analysis is compelling. Moreover, upon the existing record, the Court finds that Huntsman has failed to meet its burden of proving that the six $5,000.00 payments or the commissions were intended to be a contemporaneous exchange for new value.

### C. Subsequent New Value

▮ Several recent circuit court decisions address the section 547(c)(4) defense to preference claims.[7] See Mosier v. Ever–Fresh Food Co. (In re IRFM, Inc.), 52 F.3d 228 (9th Cir.1995); Laker v. Vallette (In re Matter of Toyota of Jefferson, Inc.), 14 F.3d 1088 (5th Cir.1994). In IRFM, the Court of Appeals for the Ninth Circuit noted that the exception contains two components: a) that the creditor must give unsecured new value, and b) that the new value must be given after the preferential transfer. The court also observed that the majority of courts add "a short hand approach to section 547(c)(4)(B) and hold that section 547(c)(4) contains a third element, that the new value must remain unpaid." IRFM, 52 F.3d at 231 (citing In re Kroh Bros. Dev. Co., 930 F.2d 648 (8th Cir.1991) (the relevant inquiry is whether the new value has replenished the estate); In re New York City Shoes, Inc., 880 F.2d 679, 680 (3d Cir.1989); In re Jet Florida System, Inc., 841 F.2d 1082, 1083 (11th Cir.1988); In the Matter of Prescott, 805 F.2d 719, 731 (7th Cir.1986)). However, the Court of Appeals for the Ninth Circuit observed that a recent trend has emerged that does not bar the new value defense altogether anytime new value has been repaid, allowing the defense when the trustee can recover the repayment by some other means. IRFM, 52 F.3d at 231. The court explained:

> If the debtor has made payments for goods or services that the creditor supplied on

---

11 U.S.C. § 547(c)(1).

**6.** Section 547(a)(2) provides the following:
(a) In this section— ...
(2) "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.
11 U.S.C. § 547(a)(2). See generally In re Aero–Fastener, Inc. 177 B.R. 120, 137–38 (Bankr. D.Mass.1994).

**7.** Section 547(c)(4) provides the following:
(c) The trustee may not avoid under this section a transfer—
(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor....
11 U.S.C. § 547(c)(4).

unsecured credit after an earlier preference, and, if these subsequent payments are themselves voidable as preferences (or on any other ground), then under section 547(c)(4)(B) the creditor should be able to invoke those unsecured credit extensions as a defense to the recovery of the earlier voidable preference. On the other hand, the debtor's subsequent payments might not be voidable on any other ground and not voidable under section 547, because the goods and services were given C.O.D. rather than on a credit, or because the creditor has a defense under section 547(c)(1), (2), or (3). In this situation, the creditor may keep his payments but has no section 547(c)(4) defense to the trustee's action to recover the earlier preference. In either event, the creditor gets credit only once for goods and services later supplied.

*Id.* at 231–32 (quoting Vern Countryman, *The Concept of a Voidable Preference in Bankruptcy,* 38 Vand.L.Rev. 713, 788 (1985) (emphasis added and footnotes omitted) *quoted in Matter of Toyota of Jefferson,* 14 F.3d at 1092–93). Thus, the court allowed a creditor to use subsequent new value advances to offset prior (although not immediately prior) preferences, stating "[a] creditor is permitted to carry forward preferences until they are exhausted by subsequent advances of new value." 52 F.3d at 232. *See In re Thomas W. Garland, Inc.,* 19 B.R. 920 (Bankr. E.D.Mo.1982). *But see Leathers v. Prime Leather Finishes Co.,* 40 B.R. 248 (D.Me. 1984) (new value advanced may be used to offset only the immediately preceding preference). The Court of Appeals for the Ninth Circuit concluded its discussion of the subsequent new value defense by adding qualifications to the approach set forth in *Garland:*

First, to calculate the new value defense, consideration must be given to whether an increment of new value has been paid for by something other than an avoidable transfer. If so, this increment of new value may not be included in calculating the amount of the new value defense.

Second, assurance must be given that the creditor will not attempt to obtain double credit for a transfer. This requirement may be satisfied by disallowing a creditor from asserting a separate section 547(c)

defense against a preference when the creditor has already used section 547(c)(4) to offset that preference.

52 F.3d at 233.

In *Kroh Brothers,* the Court of Appeals for the Eighth Circuit considered the availability of the section 547(c)(4) defense when the creditor received payment for the goods or services constituting new value from a third party, a situation analogous to the instant case. The court observed that the beneficial effect on the creditor from payment by the third party is not the decisive component of the requisite inquiry. Rather, the court stated that the availability of the defense depended upon the whether the new value depleted or replenished the estate insofar as unsecured creditors were concerned. 930 F.2d at 653.

Huntsman's arguments with respect to the subsequent new value defense fail to adequately address the paradigms set forth above. Ignoring the *precise* timing and significance of Huntsman's decision to invoice W.R. Grace directly, and the effect of this decision on the Debtor's bankruptcy estate, Huntsman maintains 1) that it advanced new, unsecured credit to Dooley after receiving the payments and crediting the commission which the trustee challenges as preferential, and 2) that after the date of the challenged payments and commission credits it shipped new orders to Dooley's customers. According to Huntsman, because of these subsequent advances of new unsecured credit, the Trustee may not avoid the prior transfers.

The Joint Statement of Uncontested Facts lacks detail as to when products were shipped to W.R. Grace. Accordingly, the Court finds that Huntsman's argument with its lack of specific reference to the timing and value of the new credit extended to W.R. Grace for the benefit of Dooley is inadequate to sustain its motion for summary judgment with respect to section 547(c)(4).

### D. *Setoff Under Section 553(a)*

The Court finds that there is no dispute as to whether Huntsman established all the elements required for setoff under section 553(a) with respect to the commission

credits.[8] *See WJM*, 840 F.2d at 1011–1012 ("to be considered mutual, 'debts must be in the same right and between the same parties, standing in the same capacity.' "). However, the Trustee raises an issue under section 553(a)(3)(C): whether the debt owed to the Debtor (i.e., the obligation to pay commissions on goods shipped to W.R. Grace) was incurred by Huntsman "for the purpose of obtaining a right of setoff against the debtor." *See* 11 U.S.C. § 553(a)(3)(C).

During the spring of 1992, McAtee was unaware that Dooley was contemplating filing a bankruptcy petition. However, Huntsman altered its prior practice and began invoicing W.R. Grace directly for the goods it shipped, and it began crediting the commissions to Dooley's account on a monthly basis. The Trustee argues that by continuing to pay Dooley a commission on sales to W.R. Grace Huntsman was in reality merely reducing Dooley's obligation to it, thereby satisfying the test of section 553(a)(3)(C). Since Huntsman has failed to address this specific argument, and circumstantial evidence supports the Trustee's position, the Court cannot enter summary judgment in its favor on its section 553 defense.

## IV. CONCLUSION

In accordance with the foregoing, the Court hereby allows the Trustee's motion for summary judgment and denies the Defendant's motion for summary judgment.

8. Section 553 provides in relevant part the following:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed;

(2) such claim was transferred by an entity other than the debtor, to such creditor—

(A) after the commencement of the case;

(B)(i) after 90 days before the date of the filing of the petition; and

(ii) while the debtor was insolvent; or

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition;

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.

11 U.S.C. § 553(a).